deciding the case on the relevant evidence concerning the crime and the defendant. Booth v Maryland 482 US 496, 107 SCt. 2529, 96 LEd 2d 440 (1987); Hance v Zant 696 F2d 940 (11th Cir. 1983); U.S v Shazaleh 58 F3d 240 (6th Cir. 1997); ABA Standards for Criminal Justice, 83-5.8 (2nd Ed. 1982); People v Carner 117 Mich App 560, 324 NW2d 78 (1982); People v Owens 108 Mich App 600, 310 NW2d 819 (1981); People v Springs 101 Mich App 118, 300 NW2d 315 (1980).

The U.S. Supreme Court has stated that prosecutors must "refrain from improper methods calculated to produce a wrongful conviction". Dorchy v Jones 320 F. Supp 2d 564 (ED. Mich 2004) citing Berger v U.S., supra. where even the state courts have held that a prosecutor should take pains to avoid even the appearance of improper argument. People v Bennett 393 Mich 445, 224 NW2d 840 (1995).

The prosecutor being a seasoned pundit intentionally manifested the passions and prejudices in the jury by appealing to sympathy and contrasting the Petitioner's mother, who could at least visit her son, with the victims mother, who only had a photograph.

Actions and remarks that are strictly set to arouse passions and prejudices of a jury and affect substantial rights of a defendant are prohibited. U.S. v Chalkias 971 F2d 1206 (1992); Rodriguez v U.S. 506 US 926, 113 SCt. 351, 121 LEd 2d 265 (1992), and a new trial warranted where prejudice results to the opposing side from the remarks of counsel in the opening statement, which was not cured by action of the court or by other circumstances. 28 ALR 2d 961 (1950).

The critical inquiry is whether the statements would have so influenced the jury that without them there was a reasonable probability that the result would have been different if the proceedings had been conducted properly. Darden v Wainright 477 US 168, 106 SCt. 2464, 91 LEd 2d 144 (1986); Foy v Donnelly 959 F2d 1307 (5th Cir. 1992); Jackson v Johnson 194 F3d 641 (5th Cir. 1999).

It is the duty of the prosecutor to see that the person

charged with a crime receives a fair trial so far as it is in his power to afford him one, and likewise his duty to use his best endeavor to convict persons guilty of a crime; and in the discharge of his duty an active zeal is commendable yet his methods to procure a conviction must be such as accord with the fair and impartial administration of justice...People v Dane 59 Mich 550, 26 NW 781 (1886). see People v Guenther 188 Mich App 174, 469 NW2d 59 (1991); People v Duncan 402 Mich 1, 260 NW2d 58 (1977). Therefore, the prosecutor must be especially cautious when the offense charged is highly inflammatory People v Brocate 17 Mich App 277, 169 NW2d 483 (1969).

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process". Donnelly v DeChristeforo 416 US 637, 643, 94 SCt. 1868, 40 LEd 2d 431 (1974).

When addressing a claim of prosecutorial misconduct, the court must first determine whether the challenged statements were indeed improper. see U.S. v Francis 170 F3d 546, 549 (6th Cir. 1999) Upon a finding of such impropriety, the court must then "look to see if they were flagrant and warrant reversal".

Flagrancy is determined by an examination of four factors: "(1) the likelihood that the remarks would mislead the jury or prejudice the accused (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial". Hicks v Collins 384 F3d 204 (6th Cir. 2004). see Boyle v Million 201 F3d 711, 717 (6th Cir. 2000); Byrd v Collins 209 F3d 489 (6th Cir. 2000); Serra v Michigan Dept. of Corrections 4 F3d 1348, 1355-1356 (6th Cir. 1993); Kincade v Sparkman 175 F3d 1348, 1355-1356 (6th Cir. 1993); Pritchett v Pitcher 117 F3d 959, 964 (6th Cir. 1999). [T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial, or so gross probably to prejudice the defendant'". Pritchett 117 F3d

at 964.

Petitioner states that the aforementioned prosecutorial misconduct produced such an atmosphere that it undermined the total confidence in the fundamental fairness of the state adjudication which certainly justifies the issuance of the federal writ Teague v Lane 489 US 288, 311-314, 109 SCt. 1060, 103 LEd 2d 334 (1989); Mackey v U.S. 401 US 667, 692-694, 91 SCt. 1160, 28 LEd 2d 404 (1971) quoting Rose v Lundy 455 US 509, 544, 102 SCt. 1198, 71 LEd 2d 379 (1982).

Finally, Petitioner states that the State court ruling is contrary to, and involves an unreasonable application of, clearly established Federal law as determined by the Supreme Court. Williams v Taylor 529 US 362, 120 SCt. 1495, 146 LEd 2d 389 (2000).

In Petitioner's decision rendered by the Michigan Court of Appeals the court stated, "Arguably, some of the prosecutor's opening statements fell outside the realm of non-argumentative factual discussion." However, the court relied upon People v Graves 458 Mich 476, 486, 581 NW2d 229 (1998); People v Kennebrew 220 Mich App 601, 608, 560 NW2d 354 (1996); People v Bahoda 448 Mich 261, 276, 531 NW2d 659 (1995), in that, the mere instructions to decide the case based upon its evidence was sufficient to cure any prejudice, and that the remarks of the prosecutor did not constitute plain error, all of which were contrary to, and involved an unreasonable application of clearly established Federal law.

Williams v Taylor, supra held that a state court decision can be "contrary to" this Court's clearly established precedent in two ways. First, if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours. Green v French 143 F3d 865, 869-870 (1998).

The Supreme Court has held that the conduct of the

prosecutor must meet a high standard and that his duty is to refrain from any impropriety that produces a wrongful prosecution Berger v U.S., supra; Viereck v U.S., supra, or that which is calculated to arouse the passions or prejudices of the jury to convict outside the presentation of evidence U.S. v Rodriguez, supra.

Michigan court of appeals held it improper for prosecutors to appeal to jurors sympathy, and even when absent an objection, reversal is required People v Wolverton, supra; People v Vaughan, supra, in that it substantiates a review for manifest injustice. People v Grant, supra. State court of appeals have also held it improper for prosecution to engage in the type of conduct that disparages defense attorney. People v Dalessandro, supra; People v Kent, supra, and above all have set perimeters regarding non-argumentative opening statements. MCR 6.414(B); U.S. v Dintz, supra, wherefore statements should not be tailored to produce a prejudicial mindset that will negate the sworn "fair and partial" duty of a jury.

Petitioner states that state appeals court decision to affirm his conviction is contrary to clearly established Federal law and wholly unreasonable when considered in its totality, and considering these plain and highly prejudicial errors this court should reverse and grant a new trial.

## ARGUMENT III

### A. PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHICH DENIED A FAIR TRIAL

Trial counsel Stephen Taratuta was appointed to defend Petitioner and his trial for First Degree Murder.

Attorney Taratuta fell below a reasonable standard of performance as guaranteed by the 5th Amendment when he: (1) failed to elicit the plea agreements of the testifying co-defendants Johnathan Nettles, Lynell Drake, and Patrick Roberts which greatly benefitted them by eliminating the possibility of being sentenced to mandatory life for First Degree Murder, of life or any other term of years for Second Degree Murder; (2) failure to argue that as a matter of Michigan Law and Due Process, Petitioner was entitled to an instruction that intoxication was a defense to the specific-intent crime of First Degree Murder; (3) failure to investigate and present an available Alibi Defense through neglecting to call available alibi witness Latoya Smith, failing to interview or call any of the Detroit Police Officers associated with the crime scene, or any of the eye witnesses whose testimony contradicts that of testifying co-defendants; (4) failure for timely and properly objecting during trial to numerous constitutional violations which warranted reversal of Petitioner's conviction to wit: (A) the trial judge improperly interrupted Petitioner as he attempted to establish that Good Cause existed for having trial counsel replaced, (B) where a very real conflict of interest existed for trial counsel's failure to prepare himself for trial, and (C) where success of Petitioner's motion for replacement counsel existed. The abuse of discretion which arises out of the trial court's denial of Petitioner's motion constitutes a denial of Petitioner's 14th Amendment Right to a fair trial.

That the Prosecuting Attorney committed numerous misconducts, which trial counsel Taratuta failed to object to.

He gave argumentative and prejudicial comments in his opening statements, he improperly vouched for Petitioner's guilt

40

and interjected his personal opinion of Petitioner's guilt by
telling the jury that Petitioner was lying and stating, "I've
never seen a person that could turn on and off the way that
he could". He improperly appealed to the jury for sympathy for
the deceased in his closing remarks all of which is reversible
error, and that which attorney Taratuta failed to timely or
properly object to this.

Attorney Taratuta also failed to object to the trial courts
jury instruction regarding the testimony  of Petitioner's co-
defendants, who testified in exchange for leniency, which must
be viewed as merely Disputed-Accomplice testimony where the
evidence   clearly   indicated   that   the   co-defendants   were
accomplices and the Standard Accomplice-Testimony instruction
should have been given. This erroneous instruction impacted
greatly on the deliberation of the jury regarding their view
of whether the co-defendants in fact testified out if a motive
to tell the truth, or as a result of the plea agreement in which
they had entered into in exchange their testimony.

Attorney Taratuta further failed to timely and properly
object to the structural error created by the trial court in
giving the jury defective Reasonable Doubt Instructions.

In light of the numerous errors which occurred during the
course of Petitioner's trial, attorney Taratuta was further
ineffective, for failing to object during the course of his
representation, that cummulative errors deprived Petitioner
a fair trial, and reversible error.

Under Federal Law the appropriate standard of review for
Ineffective Assistance of Counsel is De Novo. STRICKLAND V
WASHINGTON 446 US 668, 104 SCt 2052, 80 LEd 2d 674 (1984); BELL
V CONE, 535 US 685, 122 SCt 1843, 152 LEd 2d 914 (2002) MATTHEWS
V ABRAMAJITYS 319 F3d 780 (6th Cir. 2003); PEOPLE V TOMA 462
Mich 281, NW2d 694 (2000).

Every accused is entitled to the effective assistance of
counsel for his defense, US CONST. AM VI, CONST. 1963 Art. 1,
sec 20. A claim of Ineffective Assistance of Counsel is actually
when a defendant shows "that Counsel's performance was deficient

and that, under the objective standards of reasonableness, Counsel made an error so serious that counsel was not functioning as an attorney as guaranteed under the Sixth Amendment. Moreover, the defendant must overcome the presumption that he challenged action might be considered trial strategy. Second, the deficiency must be prejudicial to the defendant". STRICKLAND V WASHINGTON 446 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1994); PEOPLE V PICKENS, 446 Mich 298, 521 NW 2d 797 (1994).

Trial counsel's performance was inadequate under this standard and violated Petitioner's Sixth Amendment Right to effective assistance of counsel. Of the various claims of counsel error presented in the following paragraphs it is Petitioner's claim, that relief is warranted, as the errors made by the counsel were outcome determinative. To satisfy the prejudicial prong of STRICKLAND, a Petitioner need only show a "reasonable probability" that the ineffective conduct is "sufficient to undermine confidence in the outcome". BOUCHILLION V COLLINS, 907 F2d 589, 595 (CA 5, 1990).

The claim should be reviewed de novo, and given the varied attempt to obtain an evidentiary hearing by Petitioner, to reach an accurate adjudication, an order granting allowance to make a recorded account to support the factual portion of each claim, should be made.

> A. TRIAL COUNSEL FAILED TO ELICIT THAT THE PLEA AGREEMENT OF THE TESTIFYING CO-DEFENDANTS GREATLY BENEFITTED THEM BY ELIMINATING THE POSSIBILITY OF BEING SENTENCED TO MANDATORY LIFE FOR FIRST DEGREE MURDER, OR LIFE OR ANY TERM OF YEARS FOR SECOND DEGREE MURDER.

Co-defendant JOHNATHAN NETTLES admitted entering a plea bargain, in which he agreed to testify truthfully as to all matters pertaining to Petitioner and co-defendants LYNELL DRAKE and PATRICK ROBERTS; he also testified that he pled guilty to a 'lesser charge', than first degree or second degree murder. (T, 52, 58-59; 4/5/00). Co-defendant LYNELL DRAKE testified

that he had entered a plea agreement, pleading no contest to a lesser offense, in exchange for getting probation in the juvenile system and avoiding first-degree murder, and second-degree murder. (T, 121; 4/5/00). Co-defendant PATRICK ROBERTS also testified that he took a lesser plea, to avoid a conviction of first-degree or second-degree murder. (T, 141; 4/5/00).

Through out each opportunity of questioning the co-defendant's counsel at no time attempted to elicit from any of them, the penalties for first or second degree murder; the specific lesser charge that each had pled to in exchange for their testimonies at Petitioner's trial, nor the reduced penalties they were now facing as a result of their co-operation.

While questioning co-defendant NETTLES in this area, the line of questioning went as follows:

QUESTIONING OF J. NETTLES BY COUNSEL TARATUTA

Q: Now you did enter into an agreement with the prosecution to testify, correct?
A: Yes, sir
Q: You just came here last week and pled to a lesser charge in front of the Judge, correct?
A: Yes, sir
Q: And in return they dropped the open murder charge against you, correct?
A: Yes, sir
Q: You are aware that open murder can be murder 1 or murder 2 correct?
A: Yes, sir
Q: You understand the penalties for murder 1 and 2?
A: Yes, sir
Q: you understand for the lesser offense you pled to is a lot less that murder one or two?
A: Yes, sir
MR. TARATUTA: Nothing further at this time, Your Honor.(T, 58-59, 4/5/00)

Counsel made no more than a cursory inquiry into a very serious aspect of Petitioner's case, to wit: the credibility of the testifying co-defendants.

This aspect is critical to the defense of Petitioner, because the evidence failed to show that Petitioner had any

personal motive to commit this crime. The only person with an apparent motive was JOHNATHAN NETTLES, who admitted that his pride was hurt when DARRYL TOWNS beat him in a fight. (T, 53, 4/5/00). A fact that appeared to still effect MR. NETTLES when brought up:

### QUESTIONING OF L. DRAKE BY COUNSEL TARATUTA

Q: he beat you down?
A: I did'nt fall.
Q: Pride was bruised was'nt it?
A: Yes, sir (T, 53; 4/5/00)

The tale of events that transpired the night MR. TOWNS was shot, was by now more easily and readily known. There was proof of problems because there were multiple parties involved, the assault occurred at night, and the assailant wore a mask and could only be seen by the eyebrows. Further, the testimony showed that there were two individuals across the street, one of whom came over and shot decedent. The evidence leaves it a mystery as to the identity of this other individual, whom the defense contended was the shooter. In the darkness, confusion, noise and shock, certainly it was quit possible that the shooter was misidentified. Joseph Marshall, cousin of the decedent, only remembered the shooter's bushy eyebrows.

As Mr. Marshal was identifying the Petitioner at trial as the shooter, the other co-defendants had absolute cause and motive to agree with the prosecution's theory that Petitioner was the shooter. It was critical for trial to challenge the testimony of each co-defendant by addressing the credibility of each testimony by providing that each had received huge benefits through plea agreements which took first and second degree murder off the table. Furthermore, by revealing that in each case, despite claiming that they each rendered pleas out of a desire to accept their involvement in the events that

resulted in the shooting of MR. TOWNS the plea agreement had
only been rendered days prior to Petitioner's trial. Likewise,
that sentencing had yet to be done, and loomed over each co-
defendants head as incentive to testify in a manner most
beneficial for themselves and the prosecution.

### Counsel's deficient conduct

MR. NETTELS never testified, that he actually saw Petitioner
shoot MR. TOWNS. He testified, that before any shots were fired
he ran:

#### QUESTIONING OF L. DRAKE BY PROSECUTOR KING

Q: What happened next?
A: I ran because of what he (Joseph Marshall)
said earlier.
Q: Then what happened?
A: I heard gunshots and I heard screams.
Q: When you say you ran where did you run
to?
A: I ran toward the alley (T, 49; 4/5/00)

#### QUESTIONING OF L. DRAKE BY COUNSEL TARATUTA

Q: You never saw who shot Darryl did you?
A: No, sir.
Q: You were running as matter of fact were'nt
you?
A: Yes, sir. (T, 57; 4/5/00)

A reasonably skilled defense attorney would have wanted
to show the jury, that the testimony of MR. NETTLES had a valid
reason to be deeply scrutinized, given his inability to
independently identify Petitioner as the shooter, and his huge
benefit received from pleading to a lesser charge and avoiding
a mandatory life sentence in prison for first degree murder
or a possible sentence of life for second degree murder. A
reasonable attorney, would have been absolutely entitled to
elicit from co-defendant NETTLES, a full disclosure of exactly
what he did receive in exchange for his co-operation and
testimony against Petitioner.

No sound trial strategy can be said to exist that would
forgo exposing and undermining the credibility of a witness

with motive and opportunity to commit the crime his client stands accused of but does not.

MR. DRAKE never testified that he saw Petitioner shoot MR. TOWNS. He testified that he ran before the shots were fired.(T, 117; 4/5/00) That he claim to have seen Petitioner pull a gun from his coat and point it, but did not see him fire it, or see anyone struck by the fire, as he had already ran away from the scene. (T, 116-117; 4/5/00)

This testimony contradicted the testimony given by Joseph Marshall just prior to MR. DRAKE'S testimony which stated that he (LYNELL DRAKE) was looking directly at the confrontation between himself, MR. TOWNS and the mask shooter:

QUESTIONING OF J. MARSHALL BY PROSECUTOR KING

Q: What was he doing?
A: Looking at the confrontation between me, my cousin, and the guy.
Q: And where was Lynell Drake?
A: He was looking too.
Q: Did you notice anything as to their demeanor?
A: I did'nt notice nothing untill after the shooting.
Q: So some shots were fired, is that correct?
A: Yes.
Q: What is it that you noticed about their demeanor?
A: Well, when he shot my cousin I could'nt believe it, I don't think they could believe it.
Q: What makes you think that?
A: They did'nt run untill after the shooting and it sort of shocked them.(T, 96; 4/5/00)

It therefore, was incumbent upon any reasonably skilled defense attorney, to elicit from MR. DRAKE, the benefits that he received in the exchange for his testimony and co-operation in the Prosecution's case against Petitioner and also to elicit the exact charge that LYNELL DRAKE had pled to, and what reduced the penalty he now faced.

Counsel did neither of these things, despite the need to challenge the credibility of MR. DRAKE and his motive for testifying.

No sound trial strategy can be said to exist that would allow an attorney to bypass challenging the credibility of a co-defendant co-operating with the Prosecution's theory.

MR. ROBERTS testified that he saw Petitioner shoot MR. TOWNS. A statement he has since recanted (enclosed in this brief). It must be made clear however, that MR. ROBERTS gave no factual connection to the shooting, only answered in the affirmative, when asked, "did you see your brother DAMON SMITH shoot DARRYL TOWNS"? (T. 140; 4/5/00)

Counsel had reason to probe this assertion while questioning co-defendant ROBERTS given the brevity of the question, and the lack of any supporting factual context, that would make MR. ROBERTS answer credible. He did neither.

Counsel likewise, as with the other co-defendants, did not elicit MR. ROBERTS what he had received in exchange for his plea bargain, and co-operation with the Prosecution's case. He did not ask MR. ROBERTS what lesser charge he had in fact pled to, and what reduced penalties he now faced.

At neither interval did defense counsel make an issue of the huge benefits reaped by each co-defendant in exchange for their testimony. Nor did he highlight, that despite the claim that each co-defendant had given similar earlier statements as those given at trial not one co-defendant had entered a plea of guilty untill days before Petitioner's trial.

Counsel, sought to show the jury, that each co-defendant had reason to lie during trial, through his closing arguments the next day:

## CLOSING ARGUMENT OF COUNSEL TARATUTA

The only people that say it was Damon are three co-defendants, who have been given deals by the prosecutor to avoid a conviction of Murder 1, or Murder 2. That in itself is motive to lie. That in itself should raise questions in your mind as to how you view their testimony. Because you know they got a deal. Mr. Smith did not. (T. 28; 4/6/00)

(47)

\*    \*    \*    \*    \*    \*

In the end you're the people who decides the truth. All
these deals with these juveniles said to testify truthfully
against the Defendant, against, that automatically puts them
in an adversary position. It's against him. Because of those
deals, because of the fact that the juveniles are lying.(T.
30; 4/6/00)

However he failed to lay a proper foundation by failing to
question each co-defendant on the details of their plea
agreements.

It must be considered part of counsel's strategy to
undermine the credibility of the co-defendants, and though he
made slight overtures in closing, failing to have actually done
so during the commission of the trial, must be deemed as
unreasonable conduct and not sound trial strategy.

### Prejudice Effecting The Outcome Of Proceeding

Where a co-defendant pleads guilty to a reduced charge
and this avoids a mandatory life prison term, the defendant's
right to confrontation outweighs the general rule against
divulging sentence consequences to a jury, thus permitting the
defendant to cross-examine the co-defendants on the sentencing
consideration he received in exchange for his testimony. PEOPLE
V MUMFORD, 183 Mich App 149, 455 NW2d 51, 52-54 (1990):
(defendants Sixth Amendment Confrontation Clause rights denied
where defense counsel precluded from eliciting that prosecution
witness, former co-defendant, originally faced same charges
and same mandatory, non porolable life sentence if convicted,
but in exchange for testimony against defedant,witness was
allowed to plea to a lesser offense with 10-30 year sentence).
As the Court of Appeals observed in another case:

> The credibility of a witness is an issue
> that is of the utmost importance in every
> case and defendants are guaranteed a
> reasonable opportunity to test the truth

of a witness' testimony... Evidence of a witness' motivation for testifying is highly relevant to the witness' credibility... Thus, a defendant is always entitled to have a testifying accomplice's receipt of a grant of immunity or guilty plea to a reduced charge disclosed to the jury.

PEOPLE V MCINTIRE, 232 Mich App 71; 591 NW2d 231, 246(1998), reversed on other grounds 461 Mich 147; 599 NW2d 102 (1999).

Here defense counsel failed to elicit the full extent of the testifying accomplice's guilty pleas and sentencing consequences, including the avoidance of life for murder. Despite the obligation to impeach the credibility of each individual witness. PEOPLE V SAWICKI, 4 Mich App 467 (1966).

Defense counsel did not perform a competent cross-examination of the co-defendants, that can be viewed as consistent with his own declaration of what picture he wanted to plant for the jury, to wit: that the co-defendants had motive to lie and blame the crime on Petitioner to gain their plea agreements to avoid conviction of First or Second degree murder and that the co-defendants by entering into plea deals, had been placed into an adversary position and induced them to lie on Petitioner.

Instead trial counsel gave no more than a cursory inquiry into the plea agreements, failed to mention that none of the co-defendants had been sentenced at the time of the trial, and that this fact alone gave cause to testify in whatever manner the Prosecution demanded to receive the full benefit of their pleas, and to reveal, in fact, what those deals consisted of.

Had the jury known that the prosecution witnesses had escaped potential life sentences for agreeing to testify, it very well could have changed the whole complexion of the case. Counsel's failure to elicit this information is inexplicable, and as it could not have been in pursuit of any rational trial strategy, it was ineffective. STRICKLAND SUPRA. Had he brought this before the jury, Petitioner would have had a reasonable likely hood of acquittal.

It is also necessary to mention the statements by the Court,

40

in light of the Court of Appeals ruling, that counsel did not explore the possible penalties, because the record indicates that the court prohibited counsel from doing so.

If the Court is referring to the exchange that took place during the questioning of MR. ROBERTS (T, 145; 4/5/00) it must be noted that before this exchange, both MR. DRAKE and MR. NETTLES had been questioned, and at no time did counsel explore the issue of their possible penalties. Nor did counsel make a point to challenge the Court's assumption, that MR. ROBERTS had not given any different statements that he was giving then, by posing a line of questioning that would answer, why then, had the plea agreement only been rendered days before Petitioner's trial.

It must again be noted, that since trial, this very testimony given by MR. ROBERTS, was recanted.

It is therefore necessary to include, that had counsel explored the plea agreements, he may very well have uncovered that co-defendant ROBERTS was not in fact testifying truthfully, and that he had motive to lie and did.

B.  TRIAL COUNSEL FAILED TO ARGUE THAT, AS
A MATTER OF MICHIGAN LAW AND OF DUE PROCESS,
DEFENDANT WAS ENTITLED TO AN INSTRUCTION
THAT INTOXICATION WAS A DEFENSE TO THE
SPECIFIC INTENT CRIME OF FIRST DEGREE MURDER

Evidence was introduced at trial that Petitioner had been drinking alcohol before the offense. LYNELL DRAKE testified that after they left Arteece Thomas' house, the car stopped at a liquor store, and Petitioner went in. When he came out, he tried to get into the wrong car. He testified that Petitioner had been drinking that night, and that he drank some in the car.(T, 126-127; 4/5/00). PATRICK ROBERTS testified that Petitioner had been drinking Hennessey liquor that night. Then Petitioner had gone into the liquor store and came out with a beer.(T, 142-143; 4/5/00). He testified that Petitioner had attempted to get into the wrong car upon leaving the store (T, 143-144; 4/5/00). Petitioner himself testified to buying a Colt 45 beer during his trip to the liquor store. (T, 157; 4/5/00)

The trial court ruled, over objection, that the evidence of Petitioner's drinking was not sufficient to permit the defense of "diminished capacity" through intoxication to go to the jury. (T, 180; 4/5/00).

The decision by the trial court, is a direct result of counsel's ineffectiveness in blurring the issue.

Strictly speaking, the issue was not diminished capacity, but rather, the defense was based upon voluntary intoxication, which can be a defense to specific intent crimes, as in first degree premeditated murder. PEOPLE V LEVEARN, 448 Mich 207, 528 NW2d 721, 723 (1995).

At the time of Petitioner's trial, Michigan Law still recognized voluntary intoxication as an affirmative defense to specific-intent crimes, to the extent that such voluntary intoxication renders a defendant incapable of entertaining the specific intent necessary to commit the offense. PEOPLE V ROCKWELL 481 Mich 1007; 608 NW2d 811,812 (2000). The Law has since changed, effective 9-1-02, Michigan Compiled Law 768.37 was added to abolish the voluntary intoxication defense to a

51

specific intent crime for which the defendant has the burden of proving by a preponderance of evidence that he legally obtained and properly used a medication or other substance and did not know and reasonably should have known that he would become intoxicated or impaired.

Michigan Compiled Law 768.37 was not made to be retroactive law however, is applicable to all crimes committed on or after 9-1-02.

Petitioner's issue is time specific however, and at the time of trial, voluntary intoxication was still recognized as a viable defense to specific intent crimes.

## COUNSEL'S DEFICIENT PERFORMANCE

Defense counsel did not argue properly, that Petitioner was entitled to jury instruction CJI 2d 6.2, the applicable standard instruction which requires the jury to decide whether the defendant's mind was so overcome by [alcohol] that [he could not have formed the intent to commit the specific-intent crime of the first degree murder].

There was substantial evidence introduced at trial, that made a request for such an instruction a valid and necessary action on defense counsel's part.

Trial counsel's unfortunate use of the term 'deminished capacity' in this case failed to appraise the trial court that the instruction sought actually involved intoxication, which can negate the specific intent required for first degree murder. LAVEARN SUPRA. Counsel also failed to argue that such an instruction was required by the Fourteenth Amendment Due Process, which protects against conviction except upon proof beyond a reasonable doubt of every element of the crime. In Re WINSHIP, 397 US 358, 363-364; 90 S Ct 1068; 25 L Ed 2d 368(1970), US Const, Am XIV. When a certain mental state is an issue element of the crime, the government must allege and prove that mental state. MORRISSETTE V UNITED STATES, 342 US 246, 275; 72 S Ct 240; 96 L Ed 288 (1952).

No reasonably skilled attorney would fail to put the

Prosecution to its' duty of proving every element of the crime charging his client, and this must be viewed as conduct below the reasonable standard on the part of Petitioner's trial counsel. Ineffective assistance of counsel has been found to exist where trial counsel does not properly address the issue of an intoxication defense. HARICH V WAINRIGHT, 813 F2d 1082 (11th Cir 1987):(Trial counsel deemed ineffective for failing to object to miss statement of law on intoxication defense)

### PREJUDICE EFFECTING THE OUTCOME OF PROCEEDING

There was substantial evidence from several witnesses showing that Petitioner was drinking that night, and apparently disoriented. Further, there was no showing that defendant had any personal motive to assault the decedent. Under these circumstances, the evidence of alcohol consumption was sufficient for the jury to be given the instruction as to whether Petitioner could have formed the intent to commit the crime.

Failure to instruct on this defense seriously prejudiced Petitioner. The jurors may have evaluated differently the evidence of intent, with the benefit of this instruction. In light of the trial counsel's abandonment of Petitioner's alibi defense minutes before trial, this instruction became in essence, Petitioner's only line of defense against the charge of first degree murder. The absence of this instruction deprived Petitioner of an opportunity to have the jury consider an offense less than the mandatory-life offense of which he was convicted.

Petitioner continues to assert his innocence to the crime he stands convicted of, and that this issue has created a manifest injustice. If not for the ineffective assistance of counsel, his innocence would have been asserted.

Under the STRICKLAND standard, trial counsel can not be deemed as representing Petitioner at a level of reasonable doubt competance, and this ineffective conduct, cannot be seen as any sound trial strategy, therefore prejudice must be shown to exist.

C. TRIAL COUNSEL WAS INEFFECTIVE BY FAILING
TO INVESTIGATE AND PRESENT AN AVAILABLE
ALIBI WITNESS AND ALIBI DEFENSE.

The affidavit of Ms. Latoya Smith which is included within this Petition for Habeas relief states, that she resided at the same address as Petitioner in 1999. She was able to provide an alibi for Petitioner her uncle, because they were watching the MTV Music Awards on September 9, 1999, from 9:00pm untill she went to bed. The Affidavit states that she wanted to testify at trial, but Petitioner's trial counsel prevented her from doing so; and in fact refused to interview her.

Concededly, the choice of witnesses to present at trial is left to the discretion of the trial lawyer, and it is not ineffective to decide not to present a witness. However, on information and belief the lawyer did not even interview the witness to determine how valuable the information would be.

Ineffective assistance of counsel is shown where the defendant has overcome the presumption that the challenge action might be considered sound trial strategy, and counsel's deficiency must be prejudicial to the defendant. STRICKLAND SUPRA, 446 US at 689. Ineffective assistance of counsel can result from failing to investigate and prepare for trial, failure to timely object to improper evidence, or failure to pursue sound trial strategy. STRICKLAND SUPRA.

Here, trial counsel prejudiced Petitioner rights to a fair trial. Counsel inexplicably failed to investigate an available defense of alibi. Failing to investigate alibi witness Latoya Smith and calling her at trial to raise a reasonable doubt as to whether Petitioner could have committed the crime, because he was elsewhere.

Petitioner's trial counsel failed to call a critical alibi witness who would have testified that defendant could not have committed the crime.

In this case, trial counsel ineffectively failed to support with critical witness testimony and documentary evidence the very strategy he purported to follow: to show that Petitioner

did not commit the crimes charges, and was not even present. The absent testimony may very well have made a difference in the outcome. MATTHEWS V ABRAMAJITYS, 319 F3d 780 (CA 6, 2003): (Petitioner denied effective assistance of counsel where trial counsel failed to assist in alibi defense by making no effort to present potential alibi witnesses testimony). Here, as in ABRAMAJITYS, due to counsel's failure to investigate; the jury did not hear evidence that could have been strong and persuasive, and could have changed the outcome of the trial. Therefore, ineffectiveness at trial was shown.

The failure to call an important witnesses is not excusable as constituting sound trial strategy. Ineffective assistance of counsel can result from failing to investigate and prepare for trial, or failure to pursue a "sound trial strategy". STRICKLAND V WASHINGTON, 466 US at 689. Although under STRICKLAND trial counsel's conduct is presumptively adequate, a reviewing court will show no defense to a trial lawyer's decisions that are uniformed by an adequate investigation into the controlling facts and law. MOORE V JOHNSON, 194 F3d 586, 615 (CA 5, 1999).

## COUNSEL'S DEFICIENT PERFORMANCE

"By its nature, 'strategy' can include a decision not to investigate [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course". ROGERS V ZANT, 13 F3d 384, 387 (CA 11, 1994). "The duty to investigate and prepare a defense is not limitless; it does not necessarily require that every conceivable witness be interviewed". UNITED STATES V TUCKER, 716 F2d 576, 584 (CA 9, 1983). However, an attorney "must....provide factual support for [the] defense where such corroboration is available". 716 F2d at 594.

Counsel failed to produce at trial, a witness who could place Petitioner elsewhere during the time the crime was committed. This testimony stands as the crux of Petitioner's defense, and counsel's negligence in producing this testimony, left Petitioner with no defense at all.

The prosecution's case rested wholly on the testimony of co-defendant's MR. NETTELS, LYNELL DRAKE, and MR. ROBERTS to both identify Petitioner as the shooter, and thereby placing him at the scene of the crime.

Each co-defendant was greatly rewarded for their testimonies that placed the defendant at the crime scene at the time of the shooting, which in and of itself creates doubt to the truthfulness of this testimony.

Latoya Smith would have provided a strong rebuttal to the testimony of the co-defendants, and given the jury strong persuasive evidence that would have changed the outcome of the trial.

The prosecution also introduced testimony by Arteece Thomas, cousin of Petitioner, that on the day of the shooting, Petitioner, along with the three co-defendants arrived at his house, and after conversation gave Petitioner a .32 automatic handgun that was supposedly for the purpose of addressing the confrontation that co-defendants NETTLES and DRAKE had with the deceased earlier that day. (T, 67; 4/5/00).

Petittioner however, testified that the gun he obtained from Arteece Thomas was collateral for money Mr. Thomas had yet to return. (T, 154; 4/5/00).

In preparing for the trial counsel's failure to investigate Petitioner's case becomes evident in his failure to call in support of Petitioner's alibi defense, Police officers who could attest that after searching and securing the crime scene, no shell casing of any type were retrieved from the scene.

No sound trial strategy can justify counsel's failure to rebut the Prosecution's theory that Petitioner obtained a specific caliber of handgun for the specific purpose of committing the crime charged. With testimony that revealed to the jury that no physical evidence corroborating this theory exists.

From the testimony of Joseph Marshall after the gunshots each and every person who arrived at the Towns residence to confront the deceased, fled the scene. (T, 96-97; 4/5/00)

Mr. Marshall testified specifically that:

> Q: What happened after the shots were fired?
> A: Before the last shot was fired they took
> off running.

A .32 automatic handgun, ejects spent shell casings which would be left behind after firing. By the testimony, Mr. Marshall stated, three, maybe four shots were fired.

Counsel made no attempt to explore this fact, that if the weapon the Prosecution alleged was indeed used in the shooting, casings should have been found.

Given Petitioner's assertion that he was not present and the prosecutions analogy that he was, and that he possessed a semi automatic weapon because Mr. Thomas said he did. The defense of alibi should have also included the testimony of Police officer Terrance Sims and Micheal Cook, who were the first officers to respond to the crime scene and who secured the area for the extraction of evidence.

Counsel also should have produced evidence technicians Frank Horan and Eugene Fitzhugh, who retrieved and secured the evidence found at the crime scene. none of which included shell casings.

Instead trial counsel waived introduction of any of these witnesses and in failing to do so cannot be deemed as sound trial strategy.

Failure to pursue such corroborating evidence with an adequate pretrial investigation may establish constitutionally deficient performance. TUCKER SUPRA.

Counsel further undermined Petitioner's alibi defense, by waiving the civilian witness Odeatha Boatwright who made statements to police at the scene that after the shots were fired everyone fled from the scene.

Counsel made no effort to investigate what probative value the testimony of police officer Sims and Cook evidence techs Horan and Fitzhug, or witness Boatwright might provide to Petitioner's alibi defense before deciding to exclude them from trial. This can be deemed as incompetent lawyering where the

attorney refused to perform any investigation into leads directly related and of potentially great benefit to the defense. SNADERS V RATELLE, 21 F3d 1446, 1456-1457 (CA 9, 1994).

Although trial counsel's conduct is presumed to be reasonable, "counsel must, at minimum, conduct a reasonable investigation enabling him to make informed decisions about how to best represent his client". SANDERS V RATELLE at 1456 (internal citations and quotations omitted). " Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary". STRICKLAND SUPRA 466 US at 691. Counsel is ineffective where the attorney failed to conduct a reasonable investigation and no strategic reason was demonstrated for the failure. SANDERS SUPA at 1456. Failure to call witnesses cannot be related to trial strategy where counsel failed to interview these witnesses. ELDRIDGE V ATKINS, 665 F2d 228 (CA 8, 1981); RUMMEL V ESTELLE, 590 F2d 102, 104 (CA 5, 1979) (citing Von Moltika V Gillies, 332 US 708, 721; 68 S Ct 316; 92 L Ed 309 (1948) (because investigation and preparation are keys to effective representation, attorneys have a duty to interview potential witnesses and make an independent examination of the facts circumstances, pleadings, and laws involved).

Here on the information and belief, the Affidavit of Ms. Latoya Smith shows that trial counsel was on notice that significant testimony was available for the defense, yet he failed to conduct a reasonable investigation. The affiant sought to contact trial counsel, yet counsel did not follow up with a reasonable investigation of what the witness had to offer and did not present her at trial.

As a matter of fact, counsel sought, minutes before trial to withdraw Petitioner's alibi defense through dismissal of the defense entirely.

Petitioner has alleged that counsel ill-advised him in the manner of his defense and that he only agreed to waive the presence of two alibi witnesses who could not corroborate for Petitioner's alibi during the actual time of the charged offense:

to wit Larry Austin, and Damus Taylor.

The 6th Circuit has found trial counsel to be ineffective, for similar conduct which appeared to actively bar Petitioner from introducing his alibi witness defense and failing to present admissible evidence he had that would have emphasized flaws in the state's case. MATTHEWS V ABRAMAJITY, 319 F3d 780 (CA 6, 2003).

Trial counsel did not interview alibi witness Smith, nor any other witnesses that would have been of support to the alibi defense, namely Police Officer Sims, Cook, Horan, and Fitzhugh, and witness Boatwright; to learn what they have to offer this representation is ineffective. SIMS V LIVESAY, 970 F2d 1575, 1580-1591 (CA 8, 1992) (counsel ineffectively failed to investigate information in FBI reports that test a quilt from decedent's bed revealed gunpowder residue, expl explaining lack of gunpowder on the decedent and supporting defendant's version of events); WORKMAN V TATE, 957 F2d 1339, 1345 (CA 6, 1992) (counsel ineffectively failed to locate and interview the sole witness to defendant's altercation with police); BLACKBURN V FOLTZ, 828 F2d 1177, 1183 (CA 6, 1987),cert den 485 US 970 (1988) (counsel ineffectively failed to interview an alibi witness whose name was provided by the defendant and who called and left messages at counsel's office); UNITED STATES ex rel Cossey V WOLFF, 562 F Supp 140 (ND Ill, 1983) (failed to call witnesses could not be sound trial strategy where counsel had failed to interview potential witnesses). Trial counsel's inadequate "investigation" was ineffective assistance.

### PREJUDICE AFFECTING THE OUTCOME OF PROCEEDINGS

Counsel's deficient conduct denied Petitioner a fair trial by failing to investigate alibi witness Latoya Smith counsel left Petitioner with virtually no defense at all. Petitioner never abandoned his claim, that he was elsewhere at the time of the shooting and was in fact innocent of the crime charged. During his own testimony, Petitioner re-affirmed that he was at home with his niece, Latoya Smith at the time this crime took place. (T, 175; 4/5/00).

Counsel's failure to make available corroborating evidence to Petitioner's testimony, denied the jury the opportunity to hear strong evidence that would have affected how they viewed Petitioner's version of events.

Counsel failed to challenge the state's case with rebuttal evidence that would have undermined the prosecution theory.

The only reason that the Prosecution introduced Arteece Thomas, was to elicit testimony that a weapon had been given to Petitioner, and that this weapon was in fact the weapon used to shoot the deseased.

The weapon in question has never been retrieved, nor have any bullets been positively identified to being the caliber of bullets that struck the deceased. Medical Examiner Carl Schmidt testified to the cause of death, but at no time put a specific caliber to the gunshot wounds that caused the death of the deceased. Nor have any bullets or fragments been retrieved.

Arteece Thomas' testimony, was clearly for the purpose of placing a weapon in the hands of Petitioner, and to create a means to carry out the crime of murder by shooting the deceased.

No one present at the scene, could identify a specific calibar of weapon used to shoot the decedent, therefor, the testimony of Arteece Thomas was extremely important, as it created circumstantial evidence that would link the Petitioner to the means to carry out the charged offense.

Rebutting this testimony, becomes probative, and evidence that would do so, mandatory for Petitioner to have had a fair trial.

The states theory, does not allow for any break in action, as it proposes that after leaving the house of Arteece Thomas, Petitioner, and the three co-defendants went directly to the scene of the shooting.

Petitioner's assertion of alibi contradicts this theory and introduction of witness testimony, that would attest that no physical evidence was found, to wit: empty .32 caliber

automatic shell casing, where such evidence should have been presented.

Failing to do so, denied Petitioner of a fair trial, as it failed to hold the prosecution to the proofs of its' theory.

Had the jury heard from the Police Officers in charge of the investigation of this case and learned that they had swept the crime scene, and did not find any physical evidence that would have suggested a .32 automatic handgun had been used, this would have affected at least one juror, and the possibility that Petitioner would have been acquitted exist.

Had the jury heard from Odeatha Boatwright, an eyewitness to the shooting, who like Joseph Marshall gave a statement, that after the sots were fired everyone ran. This would have helped to support the fact that there should have been physical evidence left at the scene, if indeed the prosecution's theory were true.

The absence of this evidence, along with the absence of the one person who could place Petitioner somewhere else at the time the crime was committed, deprived Petitioner of his only defense against these charges, and it therefore deprived the jury the opportunity to hear fully, the case against Petitioner and their right to find that reasonable doubt existed.

Petitioner stands convicted of first degree murder and sentenced to a mandatory life sentence is proof of prejudice where his claim of innocence continues to exist, but was undermined by counsel at trial.

### D. TRIAL COUNSEL FAILED TO TIMELY AND
### PROPERLY OBJECT TO REVERSIBLE ISSUES

Trial counsel failed to timely and properly object to various issues that Petitioner seeks relief on within this Habeas Petition. Counsel's reasoning for each individual matter, belies any sound trial strategy and therefore ineffective assistance exist. STRICKLAND SUPRA.

The existing record is sufficient to establish that trial counsel was ineffective, and that Habeas relief is warranted. PEOPLE V SHARBNOW, 174 Mich App 94, 105-106; 436 NW2d 772 (1989).

### COUNSEL'S DEFICIENT CONDUCT
### DENIED A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL

Trial counsel failed to object to the trial court's denial of Petitioner's State and Federal Rights to a fair trial and to his Right to Effective Assistance of Counsel by the refusal to grant an adjournment and substitution of trial counsel.

Counsel was aware that Petitioner had become dissatisfied with his services, and wanted to seek replacement counsel. Trial counsel was aware that the state requirement of PEOPLE V O. WILLIAMS 336 Mich 565; 194 NW2d 337 (1972) required Petitioner to establish 'Good Cause' why replacement of counsel should be granted, as well as the Federal requirement of MORRIS V SLAPPY 461 US 1; 103 S Ct 1610 (1983) that demands Petitioner to show a breakdown in the attorney-client relationship.

With this knowledge a reasonable attorney would have protected his client's interest and insured that his client was allowed the opportunity to set forth his reasons for making the request for counsel substitution.

In this case, Petitioner was repeatedly interrupted by the Trial Court, while attempting to meet the requirements necessary to show 'Good Cause'. Trial counsel at no time objected to the Court's improper conduct. (T, 38-39; 4/5/00)

Trial counsel did not object when the Court erroneously placed the burden of investigating Petitioner's request for replacement counsel upon trial counsel by demanding that counsel investigate his own ineffectiveness. (T, 39; 4/5/00). Trial

counsel was aware that the Trial Court was required to inquire
into the reasons why defendant requested substitute counsel
BLAND V CALIFORNIA DEPT. OF CORRECTIONS, 20 F3d 1499 (9th
Cir1994) also that no attorney can be given the responsibility
of investigating his own ineffectiveness U.S. V DELMORO, 97
F3d 1078 (9th Cir 1996) and yet counsel made no abjection to
the Trial Court's actions that resulted in doing this exact
thing.

Trial Counsel did not object to the conflict of interest
created by the Trial Court at the moment he was erroneously
ordered to investigate his own ineffectiveness. Trial counsel
was aware, that when a lawyer is made to serve two masters,
a conflict of interest is created. U.S. V TATUM, 934 F2d 370
(4th Cir 1991): (Trial counsel who had to account for two
masters, when the two masters have separate defenses, constitutes
a conflict of interest).

No counsel can be deemed able to defend his client and
simultaneously be objective as to whether he has rendered
deficient representation to his client.

The trial court placed counsel in an impossible position,
that made his continued representation to Petitioner impossible
to perform, and a reasonably skilled attorney would have
objected, and sought to correct the matter at that time.

Trial counsel did make a motion to withdraw his
representation (T, 39; 4/5/00), which was denied however, trial
counsel did not provide substantial support, which existed for
the above mentioned occurrences, to have his motion to withdraw
soundly argued for the trial court's ruling.

Counsel's failure to object to the Trial Judges treatment
of Petitioner's request for substitution of counsel is
ineffective assistance. The conduct displayed by the Trial Court
toward Petitioner, is the same manner of conduct found to be
cause to discipline the Trial Court shortly after Petitioner's
case was decided; See In Re Moore 464 Mich 99; 626 NW2d 374,
and counsel's failure to object in this case was ineffective
assistance. PROCARO V UNITED STATES, 784 F2d 38 (1st Cir 1986).

## PROSECUTORIAL MISCONDUCT

Trial counsel failed to timely and properly object to Prosecutorial Misconduct that occurred during opening statements. The Prosecutor gave an argumentative and prejudice opening statement, that exceeded the limit of the purpose of an opening statement, which is "to provide background on objective facts", UNITED STATES V SMALL, 74 F3d 1276, 1283 (US App DC, 1996) cert den 116 S Ct 1867 (1996).

Trial counsel did not object to the Prosecutor's comments:

> "I suppose our defendant thought he was clever by putting a mask around the bottom portion of his face. But what he did'nt count on was that, that mask would be unveiled by the very people who he chose to commit this crime with.
> Ladies and gentleman, make no mistake about it, crimes conceived in hell don't have angels as witnesses..." (T, 179; 4/4/00)

despite having knowledge that the comment was improper.

When trial counsel fails to object to highly prejudicial opening remarks by the prosecutor, ineffective assistance of counsel exist. SEEHAN V STATE OF IOWA, 37 F3d 389 (9th Cir 1994).

No responsible attorney can be said to overlook objections to comments that will prejudice the jury's perception of the state's case and their duty to prove the contents of its' opening argument. No sound trial strategy can be said to exist from trial counsel's failure to properly and timely object.

Trial counsel failed to timely and properly object to the prosecutor vouching for defendant's guilt and injecting a personal opinion of guilt by telling the jury that Petitioner was lying, and stating, "I've never seen a person who could turn on and off emotion the way that he could." (T, 14; 4/6/00).

Trial counsel was aware that misconduct exist where a prosecutor vouches for a defendant's guilt. Doing so encourages a jury "to suspend its' own powers of critical analysis and judgement in deference to those of the police and prosecutor" who believes the defendant was guilty. PEOPLE V HUMPHEYS, 24 Mich App 411, 418; 180 NW 2d 328 (1970). Counsel was also aware

that misconduct existed where a prosecutor speculates on a defendant's mental state, as with the comments regarding Petitioner turning on and off his emotions. Yet in neither instance did counsel object.

This has constituted ineffective assistance of counsel in the past U.S. V WOLF 787 F2d 1094:(Trial counsel's failure to object to improper and inflammatory remarks by the prosecution used to show defendant as a bad character, constituted ineffective assistance of counsel.

A reasonably skilled attorney would have objected to the prosecutions remarks. No sound trial strategy can be said to exist that would find benefit in allowing the jury to be exposed to erroneous opening arguments as in Petitioner's case.

Trial counsel failed to timely and properly object to the Prosecutorial Misconduct that occurred from the prosecutor improperly appealing for sympathy for the victim.

The prosecutor argued:

> "I think all of us feel for, like Judge Moore himself feel for the defendant's mother because she had two sons mixed up in this. But, ladies and gentleman, I also feel for the victims mother, but you are not to decide this case based on sympathy. On the facts alone.
> But see the defendant's mother will see him, she'll get to see both her boys. Mrs. Towns on the other hand, the only thing I can give her back is the picture she gave me and to ask her to hold on to her memories. (T, 20; 4/5/00)

Trial counsel was aware that such appeals for sympathy have been long deemed to be improper. US V DLEOACH 504 F2d 185 (CACC, 1974) cert den 425 US 909 (1976). Again failed to object.

No responsible attorney would allow such comments, to go unchallenged given its' damaging and prejudicial effect to a jury. Trial counsel's failure to object constituted ineffective assistance.

### ERRONEOUS JURY INSTRUCTION

Trial counsel failed to timely and properly object to the courts refusal to charge the jury with a Standard Accomplice-Testimony instruction as to how the jury view the testimony

of the three co-defendants.

Substantial evidence was given to show that the co-defendants were Accomplices of the charged offense, and not disputed accomplices as the court charged the jury.

The Prosecutor made constant references to Petitioner's "co-defendants". In his opening remarks (T, 176-177; 4/4/00). In his closing remarks, the Prosecutor portrayed the three co-defendants as accomplices.

The trial court acknowledged that all three of these witnesses knew that Petitioner had a gun, "which means there were no innocent accomplices... Everyone of them had to know what... effect a gun would have." (T, 3-4; 4/6/00). The trial court however, rejected the Accomplice-Testimony instruction, because no one stated from the witness stand, "yeah, we agreed to go over there and kill him".

Trial counsel indicated that he was satisfied with those instructions, in spite of it being contrary to the evidence introduced at trial. In failing to object counsel allowed the jury to go into deliberation viewing the co-defendant's testimony with less scrutiny than it should have done.

No reasonably skilled attorney would by pass the duty to object and make an argument for a jury instruction, that besides being justified, was more beneficial for his client than the instruction being presented. This was ineffective assistance of counsel.

Trial counsel failed to timely and properly object to a defective reasonable doubt instruction that trial court gave to the jury. The trial court instructed the jury on reasonable doubt as such:

> "What's a reasonable doubt, a reasonable doubt is fair honest doubt, which can come from the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on a reason and common sense. Now, Lord knows we need you to use your reason and common sense to look at the evidence as you should anything, and apply your reason and common sense in determining the facts of this case.
>
> A reasonable doubt is just that, a

doubt that is reasonable after a careful
and considered examination of the facts
and circumstances of this case. (T, 40;
4/6/00)

This was erroneous as it failed to instruct that a
reasonable doubt is one which would cause a person of ordinary
prudence to hesitate to act in the more important affairs of
life.

Counsel was aware of the magnitude the reasonable doubt
instruction holds in the deliberation phase of the trial, and
should have known that the instruction given by the court was
not correct. An objection should have been made, and counsel
was ineffective for failing to do so.

## CUMULATIVE ERRORS

Numerous errors have been raised throughout Petitioner's
Hebeas Petition. During the course of Petitioner's trial, counsel
should have made objections that the cumulative errors should
have been deemed to have such prejudicial effect to deny
Petitioner the Due Process Right to a fair trial.

Regardless to what trial strategy trial counsel held, an
objection to the cumulative errors should have been made and
argued that a new trial was required.

Counsel's failure to do so, belies his advocacy for
Petitioner and demonstrates a true reflection of the degree
of ineffective representation displayed during the course of
trial.

No reasonable attorney, would overlook the prejudicial
effect that multiple errors of the magnitude as displayed in
this instant case, where there are errors by both the Court
and Prosecutor throughout the trial along with counsel's own
ineffective conduct and no objection that a fair trial has been
denied his client. Trial counsel made no objection and therefore
was not functioning as the counsel guaranteed by the Sixth
Amendment.

In the instances of failure to object to errors, whether
viewed individually, or as a whole, is conduct below a reasonable

standard, and is not justifiable as any form of trial strategy. This conduct falls short of the requirements of <u>STRICKLAND</u> and is therefore ineffective.

## PREJUDICE EFFECTING THE OUTCOME OF PROCEEDING

Where counsel did not object to the Trial Courts improper conduct when interrupting Petitioner as he attempted to show Good Cause why substitute counsel was warranted, this denied Petitioner a full and fair hearing, as guaranteed by the Supreme Court ruling of <u>KEENY V TAMAYO-REYES</u> 504 US 1; 112 S Ct 1715; 118 L Ed 2d 305(1992). Which deprived him of the ability to set forth valid grounds to have trial counsel replaced. Depriving Petitioner of his Sixth Amendment right to effective representation.

Trial counsel's failure to object to the Trial Court ordering him to investigate his own ineffectiveness created an irreparable conflict of interest that continued through the remainder of the trial and prejudiced Petitioner, by forcing him to trial with a defense attorney, with other interest that ran directly afoul to his proper representation of Petitioner. Where a strategic action could have benefited Petitioner, if it threatened to expose any current or earlier ineffectiveness on counsel's part. This action would most assuredly be overlooked. The numerous acts of improper conduct by counsel gives weight and creed to this rationale, as it is not easily explained away as trial strategy.

Trial counsel's failure to object to the prosecutor's improper comments, created a prejudicial atmosphere that gave the jury reason to see Petitioner as nothing more than a bad person worthy of prison. Had the jury been spared the Prosecutor's improper comments they would have entered the deliberation phase of trial untainted and found sufficient ground to vote for an acquittal especially with an opportunity to properly view the evidence.

Trial counsel's failure to object to the erroneous jury instruction prejudiced Petitioner as it put before the jury

an improper view of how to gauge Petitioner guilt or innocence. Had the correct instruction been given each juror would have seen differently the testimony of the three co-defendants, and found therein a lack of credibility. With a reasonable doubt instruction supplement a proper view of the co-defendant's testimony as being those of Accomplices, it is conceivable that jurors would have found reasonable doubt and voted to acquit.

It is therefore shown, that the STRICKLAND standard has been in regards to counsel conduct in failing to properly and timely object and preserve Constitutional errors that effected the outcome of Petitioner's trial.

Lastly, Petitioner states that the state court's ruling is contrary to, and involves an unreasonable application of, clearly established federal Law determined by the U.S. Supreme Court. WILLIAMS V TAYLOR 529US 362, 120 S Ct 1495, 146 L Ed 389(2000).

The Michigan Court Of Appeals categorically denied Petitioner's claims of ineffective assistance of counsel stating that "there review is limited to errors apparent on record and that Defendant's cursory treatment of this issue is insufficient to properly present it for our review" citing PROPLE V AVANT, 235 Mich App 499, 597 NW2d 864 (1999); PRINCE V MCDONALD, 837 Mich App 186, 602 NW2d 834 (1999).

Petitioner has irrefutably substantiated numerous reversible disparities in trial counsel's representation, that are of record, as well as implied through the end result that denied Petitioner his constitutional right to effective assistance of counsel STRICKLAND V WASHINGTON, supra.

Petitioner, through a plethora of case law, has clearly illustrated his argument of effective assistance of counsel, and more importantly the clearly established Federal law which the state court of appeals have negated regarding an issue(s) of such importance. BOUCHILLON V COLLINS, 907 F2d 589(1990); HARICH V WAINWRIGHT, 813 F2d 1082(1987); MOORE V JOHNSON, 194 F3d 586 (1999); U.S. V TUCKER, 716 F2d 576(1983); SANDER V RATELLE, 21 F3d 1446(1994); SIMS V LIVESAY, 970 F2d 1575 (1992);

WORKMAN V TATE, 957 F2d 1339 (1992); MORRIS V SLAPPY, 461 US 1, 103 SCt. 1610, 75 LEd 2d 610 (1983); U.S. V DELOACH, 504 F2d 185 (1974); KEENEY V TAMAYO-REYES, 504 US 1, 112 SCt. 1715, 118 LEd 2d 305 (1997).

Petitioner states that the Appeals Court decision is contrary to clearly established federal law and completely unreasonable when considered in its totality, and considering counsel's plain and deficient actions which amounts to effective assistance this court should Grant a Certificate of Appealability.

## ARGUMENT IV

IV ERRONEOUS INSTRUCTION REQUIRING REVERSAL

A. THE TRIAL COURT PLAINLY AND PREJUDICIALLY ERRED IN INSTRUCTING THAT CODEFENDANTS, WHO HAD PLED GUILTY AND RECEIVED LENIENCY IN EXCHANGE FOR THEIR TESTIMONY, WERE MERELY DISPUTED ACCOMPLICES, RATHER THAN GIVING THE STANDARD ACCOMPLICE-TESTIMONY INSTRUCTION.

B. THE TRIAL COURT ERRONEOUSLY REFUSED TO INSTRUCT ON DIMINISHED CAPACITY DUE TO INTOXICATION.

C. A DEFECTIVE REASONABLE-DOUBT INSTRUCTION CONSTITUTED STRUCTURAL ERROR REQUIRING REVERSAL.

Standard of review and issue preservation: Under Federal Law, the appropriate standard of review is De Novo. U.S. V GRIFFITH, 17 F3d 865, 877 (1994); U.S. V NEWTON, 891 F2d 944, 949 (1984); SULLIVAN V LOUISIANA, 508 US 275, 113 SCt 2078, 124 LEd 2d 182 (1993); PEOPLE V WATKINS, 178 Mich 439, 444 NW2d (1989); PEOPLE V MOLDENHAVER, 210 Mich App 158, 533 NW2d 9 (1995); U.S. V LEONARD 494 F2d 995, 960 (1974). The issue is first raised on Appeal.

A. THE TRIAL COURT PLAINLY AND PREJUDICIALLY ERRED IN INSTRUCTING THAT CODEFENDANTS, WHO HAD PLED GUILTY AND RECEIVED LENIENCY IN EXCHANGE FOR THEIR TESTIMONY, WERE MERELY DISPUTED ACCOMPLICES, RATHER THAN GIVING THE STANDARD ACCOMPLICE-TESTIMONY INSTRUCTION.

The Prosecution relied heavily on the testimony of three alleged codefendants: Jonathan Netteles, Lynell Drake, and defendant's brother Patrick Roberts. All three identified Petitioner Damon Smith as the shooter. the only other eyewitness, Joseph Marshall, described the assailant as older than the other three, and having bushy eyebrows, with the rest of his face obscured by a mask.

The prosecutor clearly presented the codefendants as

91

accomplices in his opening statement, when he assured the jurors that they would "hear from some co-defendants... And you need not worry about them because they've been dealt with". (T, 176; 4/4/00) He repeatedly referred to them as codefendants: "codefendants Lynell Drake", and "another codefendant Patrick Roberts." (T, 176-177; 4/4/00) He referred to defendant and the other three as "all four Defendants" and "all Defendants". (T, 177-178; 4/4/00). He told the jurors "our defendant thought he was clever" by masking his face with a bandanna, but "what he did'nt count on was that, that mask would be unveiled by the very people who he chose to commit this crime with". (T, 179; 4/4/00) The prosecutor went on with his statement by telling the jury,

> Crimes conceived in Hell don't have angels as witnesses. And I in no way want to infer [sic] to you that Patrick Roberts, Lynell Drake, Jonathan Nettles are innocent of anything. But it is very necessary that we rely on these same people to unveil that mask. (T, 179; 4/4/00).

> The prosecutor then said that these people would tell how defendant tried to cover up his tracks. How he devised a plan to say that some crackhead named Buzz saw them fighting, came over and shot, and they don't know who he is or where to find him. (T, 179-180; 4/4/00).

The prosecutor also portrayed the three juveniles as defendant's accomplices, in closing argument. He argued that the defense was suggesting the codefendants blame Petitioner because they had plea agreements with the prosecutor, and stated that two of them were "singing the same song all along before there was even a plea agreement in place." (T, 13-14; 4/6/00). His argument relied heavily on their testimony. (T, 14-17; 4/6/00).

The trial court rejected the accomplice instruction sought by the defense, even though the court admitted that a jury could have found each of the individuals guilty of a conspiracy to commit first-degree murder. The trial court refused the

instruction because none of the testifying individuals stated from the witness stand, "yeah, we agreed to go over there and kill him". The trial court acknowledged that all these witnesses knew that Petitioner had a gun, "which makes them all to me-there were no innocen[ts] there... [E]veryone of them had to know what... effect of a gun would have." (T, 3-4; 4/6/00). After this, defense counsel indicated he was satisfied with those instructions. (T, 6; 4/6/00).

The trial court indicated that it would instruct the jury to view the testimony of the codefendants as accomplice testimony, which should be viewed with caution. Rather, the trial court stated it would instruct that codefendants, who had plead guilty and received leniency in exchange for their testimony, were merely disputed accomplices, rather than giving the standard accomplice testimony instruction. The trial court instructed:

> We had the testimony of three witnesses, Jonathan Nettles, Lynell Drake, and Patrick Roberts. Each of them testified here after having themselves plead (sic) guilty to an offense in connection with this whole affair.
>
> Ladies and gentlemen, it is their testimony, if you believe it, that the three of them together with the Defendant all got together conspired in a sense, that is plan and designed to go over to the house of Mr. Darryl Towns and thereby assaulted him.
>
> Specifically Mr. Nettles, Mr. Drake, and Mr. Roberts did not testify that they went over there for the purpose of killing Mr. Towns. But they did testify, if you believe their testimony, that they were there for the purpose of assaulting him, that is in some manner or another and they took with them certain equipment.
>
> They also admitted that they took with them a gun and a bat. And they have testified as to how they came upon that gun and bat. When I say took with them, their testimony was that it was for them and including Mr. Smith.

73

And they gave their testimony here after been indeed convicted by their own plea to a crime in connection with this case; because they too were charged while not with First Degree Premeditated Murder they say, they were charged in the information as we've said with open murder, which meant if they had been tried it is possible the evidence was sufficient that they could have been convicted of murder. And so to that extent, ladies and gentlemen, they are and were at the time, date and place alleged herein accomplices to what the People say was Mr. Smith who premeditated and deliberated and murdered Mr. Towns.

Ladies and gentlemen, a person who knowingly and willingly helps or cooperates with someone else in a crime is called an accomplice, that's what an accomplice is. People who go and help. And these persons at least by their testimony went there to commit a crime. That is beat up, assault, Mr. Towns. But assault him how and what they planned they certainly testified that they went there to assault him. When you think about Nettles, Drake, and Roberts' testimony first decide if he was an accomplice to that extent.

If after thinking about all the evidence you decide he Roberts, he Drake, he Nettles did not take part in this crime judge his testimony as you would that of any other witness. But if you decide that Nettles and or Drake and or Roberts was an accomplice then you must consider his testimony in the following ways: You should consider an accomplice testimony closely and be very careful about accepting.

You may think about whether the accomplice testimony is supported by other evidence because then it may be more reliable. However, there is nothing wrong with the prosecution using an accomplice as a witness. You may convict the Defendant based only on an accomplice's testimony if you believe the testimony, and it proves the Defendant's guilt beyond a reasonable doubt.

When you decide whether you believe an accomplice's testimony follow-consider the following: Was the accomplice's testimony

falsely slanted to make the Defendant seem
guilty because of the accomplices own
interest, bias, or for some other reason.

Has the accomplice been offered an[y] reward,
or been promised anything that might lead
him to give false testimony. And again there
was a plea of each of these individuals
which was worked out between their respective
lawyers and the prosecuting attorney and
was entered into on the record before this
Court.

And those agreements as to Nettles, Drake,
and Roberts [were] testified and demonstrated
before you.

Has the accomplice been promised that he
will not be prosecuted or promised a lighter
sentence or allowed to plea guilty to a
lesser serious charge. Well, they certainly
they plead [sic] guilty to a lesser serious
charge. If so could this influence Nettles,
Drake, Roberts' testimony.

In general, ladies and gentlemen, you should
consider an accomplice['s] testimony more
partially than you would that of an ordinary
witness. You should also be sure you have
examined it closely before you base a
conviction on it.

And so, ladies and gentlemen, that is how
you should consider the testimony of an
accomplice. (T, 54-57; 4/6/00).

Accomplice testimony is inherently unreliable, and a
defendant has a right to a cautionary instruction regarding
such testimony, PEOPLE V McCOY, 392 Mich 231, 236-238, 240;
220 NW2d 456 (1974). It is error requiring reversal to fail
to give such a cautionary instruction if requested and may be
error requiring reversal even without a request "if the issue
is closely drawn". McCOY. The issue is "closely drawn" if the
trial is essentially a credibility contest between the defendant
and the accomplice. PEOPLE V FREDRICKS, 125 Mich App 114, 120-
121, 335 NW2d 919 (1983).

An accomplice is one who "could be charged with the same
offense as the accused is charged". PEOPLE V THRELKELD, 47 Mich

App 691, 696; 209 NW2d 852, 855 (1973). Here, the three codefendants were in fact charged with the same offense as the accused. They were undisputed accomplices, and the jury should have been instructed. See CJI2d 5.4.

In PEOPLE V JENSEN, 162 Mich App 171; 412 NW2d 681, 688-689 (1987), a witness against defendant had pled guilty but had not yet been sentenced when he testified. Defendant did not object to disputed-accomplice instruction, yet this court reversed for plain error, stating that:

> Failure to give the correct accomplice instruction sua sponte under the circumstances of this case, where the issue was closely drawn, was error requiring reversal. If accomplice testimony is inherently suspect, and if it is the only real evidence which directly contradicts the defendant's testimony, it is extremely important that the jury weigh it properly. Allowing the jury to find that the witness was not an accomplice, when in fact he was, should not be permitted. Proper weighing of accomplice testimony in close situations is so important that the trial court should be required sua sponte to give correct instructions under circumstances such as these.

(Emphasis supplied.) Jensen controls here.

The three codefendants all pled guilty to lesser offenses in this case. It was extremely important that the jury properly weigh the inherently unreliable testimony of these three admitted accomplices. The trial court indisputably erred in failing to give an undisputed-accomplice instruction.

The People never satisfactorily explained the presence of the fifth man, the mystery man who remained across the street. Had the testimony of the three codefendants not been impermissibly bolstered, in effect, by the disputed-accomplice instruction, there was a reasonable prospect that at least one juror could have found their testimony not sufficiently persuasive. Codefendant Jonathan Nettles, whose pride was wounded

76

when he was beaten up, had the clear motive. The other codefendants, were also teenagers, peers of Nettles, and his friends. Nettles himself testified that he had not sought out defendant, but rather sought his brother Patrick Roberts in a scheme to attack Darryl Towns. Nettles claimed that Petitioner simply happened to answer the phone. Petitioner was not a peer of the three teenagers codefendants, and he had no apparent motive himself to commit the crime. Thus, the testimony of the three codefendants, who had all worked out sweetheart deals for themselves, was inherently suspect. yet the trial court's instruction tended to immunize their testimony from suspicion by the jurors, as it invited the jurors to conclude they were not accomplices despite the fact that they had pled guilty.

Petitioner suffered prejudice form the denial of the more-favorable instruction for an undisputed accomplice. the prejudice was magnified because the instruction was slanted, and suggested that the trial judge believed the three codefendants were not accomplices, by stressing that "these persons at least by their testimony went there to commit a crime, that is to beat up, assault, Mr. Towns. But assault him how..." (T, 55; 4/6/00). The trial court's suggestions as to the facts improperly invaded the province of the jury. PEOPLE v REED, 393 Mich 342; 224 NW 2d 867, 869-870(1975); PEOPLE v EDWARDS, 209 Mich App 694, 522 NW2d 727, 728-729(1994), lv den 448 mich 882; 533 NW2d 307(1995); IN RE WINSHIP, 397 US 358, 364; 90 S Ct 1068; 25 LEd2d 368(1970).

This plain and prejudicial error may have actually resulted in the conviction of an innocent man, and it certainly affected the fairness of Petitioner's proceedings; therefore, reversal is requested. PEOPLE v CARINES, 460 Mich 750, 763; 597 NW2d 130, 138(1999).

        B.   The Trial Court Erroneously Refused to Instruct on Diminished Capacity Due to Intoxication.

There was evidence that Petitioner was drinking alcohol before the offense.  Lynell Drake stated that before they went to Darryl's house, the car stopped at a liquor store, and

22

Petitioner went in.  When he came out, he tried to get in the wrong car.  Petitioner had been drinking that night, and drank some in the car. (T, 126-127; 4/5/00).  Patrick Roberts similarly testified, stating that Petitioner was drinking Hennessy liquor that night.  Then Petitioner went to the liquor store, and came out with a beer. (T, 142-142; 4/5/00).  Petitioner himself testified to buying a Colt 45. (T,157; 4/5/00).

Over a defense objection, the trial court ruled that the evidence of Petitioner's drinking liquor was insufficient to permit the defense of diminished capacity," it is clear from the context that all understood the issue was whether the defense of voluntary intoxication should be submitted to the jury. Voluntary intoxication can be a defense to specific intent crimes, such as first degree premeditated murder. PEOPLE v LAVEARN, 448 Mich 207; 528 NW2d 721, 723(1995).  Voluntary intoxication is a defense "to the extent that such voluntary intoxication renders a defendant incapable of entertaining the specific intent necessary to commit the offense. PEOPLE v ROCKWELL, 461 Mich 1007; 608 NW2d 811, 812(2000).

The application standard instruction requires the jury to "decide whether the Petitioner's mind was so overcome by [alcohol] that [he could not have formed that intent "to commit the specific-intent crime of first degree murder]." CJI 2d 6.2. Substantial evidence form several witnesses showed that Petitioner was drinking that night, and apparently disoriented. further, there was no showing that Petitioner had any personal motive to assault the decedent.  Under the circumstances, the evidence of alcohol consumption was sufficient for the jury to decide whether Petitioner had a diminished capacity to commit the crime. Cf. PEOPLE v MILLS, 450 Mich 61, 82; 537 NW2d 909(1995).  In Mills, defendant was charged with assault with intent to murder, but denial of a voluntary intoxication instruction was not error where

> there was some evidence that the defendants appeared intoxicated, but there was no testimony that the defendant actually was intoxicated, or was intoxicated to a point at which he was incapable of forming the

78

intent to commit the charged crime.

MILLS is distinguishable.  In Mills, there was evidence that the defendants were loud and obnoxious, and one of them came into a store in a hurry, nervous, and appearing "high." the trial court ruled that there was nothing in the record to show that Mills had consumed any liquor that night.  In affirming, our Supreme court stated: "We agree."  Other than appearing high or drunk, there is no indication on the record that defendant was drunk or high on drugs and was incapable of forming the intent to commit [the] crime [of assault with intent to commit murder]." 537 N.W.2d at 920-921.  The Court stated:

> A defense of intoxication is only proper if the facts of the case could allow the jury to conclude that the defendant's intoxication was so great that the defendant was unable to form the necessary intent... In the instant case, there was some evidence that the defendants appeared intoxicated, but there was no testimony that the defendant actually was intoxicated, or was intoxicated to a point at which he was incapable [of forming the requisite intent].
> MILLS, 537 NW2d at 920.

Failure to instruct on this defense seriously prejudiced the Petitioner.  The jurors may have evaluated the evidence of intent differently, with the benefits of this instruction.  The absence of this instruction deprived Petitioner of an opportunity to have the jury consider an offense less than the mandatory-life offense of which he was convicted.

Our Supreme Court subsequently abolished the defense of diminished capacity in PEOPLE v CARPENTER, 464 Mich 223, 241; 627 NW2d 276(2001), holding that "evidence of defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility by negating specific intent" was not admissible."  However, CARPENTER is distinguishable.  CARPENTER specific intent, "as the continued validity of that separate and distinct defense is not before us;" rather, the defense in question was diminished capacity, based on organic brain damage. Carpenter, 627 NW2d at 292 n10.  The unfortunate use of the term

79

"diminished capacity" in this case should not obscure the fact that the instruction sought actually involved intoxication, which can negate the specific intent required for first-degree murder. **LAVEARN**. Rather, the instruction sought reflected the fact that due process protects as accused against conviction except upon proof beyond a reasonable doubt of every element of the charged criminal offense. **IN RE WINSHIP**, 397 US 358, 363-364; 90 S Ct 1068; 25 LEd2d 368 (1970); US Const, Am XIV. Where a certain mental state is an element of the crime, the government must allege and prove that mental state. **MORISSETTE v UNITED STATES**, 342 US 246, 275; 72 S Ct 240; 96 LEd 288 (1952). (Alternatively, if this Court should conclude that trial counsel did not properly preserve this issue by a timely request for proper instructions, Petitioner contends that this would constitute ineffective assistance. See Argument III-B.)

Here, the only identification of Petitioner as the shooter came from three codefendants who all had ample motive to want to blame Petitioner, to insulate themselves as much as possible from criminal liability. Also, Petitioner had absolutely no motive to shoot the decedent. The circumstances would have been quite consistent with a jury view that Petitioner must have been intoxicated to commit the crime, and it is reasonably likely that this could have resulted in their rejection of first-degree murder. More probably than not, a different outcome would have resulted. This preserved error was therefore prejudicial, and requires reversal.

> C.  A Defective Reasonable-Doubt Instruction Constituted Structural Error Requiring Reversal.
>
> The trial judge instructed the jury on reasonable doubt as follows:
>
> What's a reasonable doubt, a doubt is a fair honest doubt, which can come from the evidence or lack of evidence. It is not merely an imaginary or possible doubt, but a doubt based on reason and common sense. Now, Lord knows we need you to use your reason and common sense to look at the evidence as you

should anything, and apply your reason and common sense in determining the facts of this case.

A reasonable doubt is just that, a doubt that is reasonable after a careful and considered examination of the facts and circumstances of this case. (T, 40; 4/6/00).

The court erroneously failed to instruct that a reasonable doubt in one which would cause a person of ordinary prudence to hesitate to act in the more important affairs of life. Reasonable-doubt instructions must impress on jurors "the need to reach a subjective state of near certitude." JACKSON v VIRGINIA, 443 US 307, 315; 99 S Ct 2781; 61 LEd2d 560 (1979). A "common-sense benchmark" of reasonable doubt is: "such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon." VICTOR v NEBRASKA, 551 US 1; 114 S Ct 1239, 1248-1251; 127 LEd2d 583 (1994). Omission of the "hesitate to act" concept violated Fourteenth Amendment due process and denied the Sixth Amendment right to jury trial. UNITED STATES v MERLOS, 8 F3d 48, 51 (US App DC 1993), cert den 114 S Ct 1635 (1994); SULLIVAN v LOUISIANA, supra.

Failure to object does not bar review, as the error is a structural error requiring automatic reversal. PEOPLE v ANDERSON (After Remand), 446 Mich 392; 521 NW2d 538, 544-545 (1994); SULLIVAN, 508 US at 280-281; NEDER v UNITED STATES, 527 US 1; 119 S Ct 1827, 1833-1834; 144 L Ed 2d 35 (1999).

Lastly, Petitioner states that the state court ruling is contrary to, and involves an unreasonable application of clearly established federal law as determined by the Supreme Court in WILLIAMS v TAYLOR, 529 US 362, 120 SCt. 1495, 146 LEd 2d 389 (2000). The Court of Appeals in its unpublished opinion (PEOPLE v SMITH, #229661, May 1, 2003) Stated "We find that the evidence at trial did not support a defense based on intoxication," that "the substance of the omitted instruction was sufficiently covered by the instructions the court did give..." that, "no error in

81

the trial court's instruction on reasonable doubt existed," and that "defendant waived his issue regarding instructing the jury on undisputed-accomplice testimony by affirmatively expressing his approval of the instruction given. All of which we're contrary to Supreme Court precedence and arrives at a result opposite this court. WILLIAMS v TAYLOR, supra. GREEN v FRENCH, 143 F3d 365 (1998).

The Michigan Court of Appeals clearly negated the established precedence of SULLIVAN v LOUISAINA, supra, (failed to give proper instructions. See also PEOPLE v MOLDENHAVER, supra.) IN RE WINSHIP, supra, (Petitioner suffered severe prejudice from a denial of undisputed-accomplice instruction. See also PEOPLE v EDWARDS, supra. MERISSETTE v U.S., supra, (where a certain mental state is an element of the crime, the government must allege and prove that mental state. See also PEOPLE v MILLS, supra.) and JACKSON v VIRGINA, supra, (failure to properly instruct the jury on reasonable doubt. See also PEOPLE v ANDERSON, supra.)

Petitioner therefore in entitled to a New Trial.

## ARGUMENT V


### CUMULATIVE ERROR REQUIRES REVERSAL

Under the Federal Law, the appropriate standard of review is De Novo. UNITED STATES V GRIFFITH, 17 F3d 865, 877 (1994); PEOPLE V HERNDON, 246 Mich App 371, 633 NW2d 376, 387 (2001).

Petitioner Smith submits that each of the issues raised in his Appellate Brief to the Michigan Court of Appeals and the Michigan Supreme Court, represents substantial, independent reversible error. However, even if any one of the multiple issues, standing alone does not constitute constitutional error, certainly constitutional error occurred when those issues are considered in the aggregate. UNITED STATES V MAY, 69 F3d 116, 123 (6th Cir. 1995):

> "...while no one of the errors we will discuss may in itself be reversible, the totality of the error compels the conclusion defendant was denied a fair trial and requires that we remove for a new trial."

see also PEOPLE V SKOWRONSKI, 61 Mich App 71, 77; 232 NW2d 306 (1975). In Accord, PEOPLE V ROBINSON, 79 Mich App 145, 149; 261 NW2d 544 (1977); PEOPLE V MORNS, 139 Mich App 550, 563; 362 NW2d 830 (1984); PEOPLE V SMITH, 158 Mich App 220, 121; 405 NW2d 156 (1987); PEOPLE V ROSALES, 160 Mich App 304, 312; 408 NW2d 140 (1987); PEOPLE V ANDERSON, 166 Mich App 455, 472, 473; 421 NW2d 200 (1988).

> "Each of the above errors merit reversal standing alone. As will be discussed below numerous other errors occurred at trial which cumulatively may have denied Petitioner a fair trial. Smith 158 Mich App at 232".

Petitioner further insist that whether considered individually or in aggregate, the issues presented in this brief demonstrate a clear and prejudicial effect of cumulative errors

that has denied Petitioner both State and Federal Constitutional rights to due process of law and a fair trial. U.S. Const. V, VI, and XIV, PEOPLE V TAYLOR, 185 Mich App 1, 460 NW2d 582, 587 (1990), and undermines the trust and integrity of a verdict. UNITED STATES V SEPULVEDA, 15 F3d 1161, 1195-1196 (1993).

Lastly, Petitioner states that the State Court ruling is contrary to, and involves an unreasonable application of clearly established Federal Law as determined by the Supreme Court. WILLIAMS V TAYLOR, 529 US 362, 120 SCt 1495, 146 LEd 2d 389 (2000).

In the instant case a decision was rendered by the Michigan Court of Appeals wherefore the court stated "Given our conclusions in the issues presented above, we find that defendant has not established that he was denied a fair trial due to the cumulative effect or errors". The court subsequently relied on PEOPLE V BOHODA, 448 Mich App 261, 531 NW2d 659 (1995), Sup. Opinion May 1, 2003 #229661, in making its' abrupt and unsubstantiated decision to deny this issue, clearly contrary to, establish Federal Law. WILLIAMS V TAYLOR, Supra.

The Supreme Court stated that a state decision can be "contrary to" this court's clearly established precedent in two ways. First, if the State Court arrives at a conclusion opposite to that reached by this court on a question of law. Second, a state decision is also contrary to this court's precedent if the State Court confronts facts that are materially indistinguishable and arrives at a result opposite to ours. WILLIAMS V TAYLOR, Supra, GREEN V FRENCH, 143 F3d 865, 869-870 (1998).

The Michigan Courts of Appeal clearly negated the precedent of UNITED STATES V MAY, Supra, in that absolutely no consideration was given to the individual merit of this issue, and certainly not the aggregated factor substantiated in Petitioner's constitutional claims and supporting Federal case Law requires a new trial.

ARGUMENT VI

PETITIONER STATES THAT
NEWLY DISCOVERED EVIDENCE REQUIRES REVERSAL

Petitioner claims that the State Court of Appeals denied his 5th, 6th, and 14th Amendent Constitutional rights. Petitioner also claims that Art 1 §20 of his Michigan Constitutional Right to Appeal was seriously prejudiced. Petitioner was restricted to review of this issue for plain error, because Petitioner failed to preserve this issue. The failure to preserve this issue was the result of the Court of Appeals denial of Petitioner's Motion to Remand for a Ginther Hearing.

The denial of Petitioner's Ginther Hearing Motion which was filed according to MCR 7.211(c)(1) to preserve the Newly Discovered Evidence, and the restricted review given to this issue for the failure to preserve that which the Court of Appeals denied Petitioner access to preserve is a "manifest injustice." People v. LaPlaunt, 217 Mich App 733 (1996)(reversed and remanded). The Michigan Constitution guarantees an Appeal of Right in every criminal prosecution. In Petitioner's case a "manifest injustice" was created by leaving Petitioner no forum in which to proceed with the very issue that created an Unconstitutional trial. This Court ignored the sworn affidavit submitted by Patrick Roberts along with Petitioner's Newly Discovered evidence. This affidavit has not been contradicted, therefore it is presumed as true. Winsett v. Donaldson, 69 Mich App. 36.

Petitioner claims that he never had the privilege of