allegations.  This effort should be deemed as a due diligent effort on behalf of Petitioner to develop the basis of this issue. See WALKER v GIBSON 228 F3d 1217, 1231 (10th cir. 2000), cert denied 121 Sct 2560: (Attempt to develop the factual basis of the claim in state court by presenting affidavits to support these claims in post-conviction proceedings and seeking an evidentiary hearing frees Petitioner from the limitations of 28 USC § 2254(a)(2). WALKER AT 1231.

  If proven true, Petitioner is entitled to habeas relief. This claim was rejected in State Court based solely upon a generalization that recanted evidence is suspicious.  The State Court rejected this claim, while refusing to allow Petitioner the opportunity to prove the evidence to be true.

  Petitioner has multiple 6th Amendment claims that require the development of the factual basis to support inorder for the proper Federal review to take place.

  Petitioner has alleged that trial counsel Taratuta did not perform in an objective standard of reasonableness, and that his performance affected the outcome of trial. STRICKLAND v WASHINGTON 466 US 668, 104 Sct 2052, 80 L Ed. 2d 674 (1984).

  Petitioner in his allegations towards counsel Taratuta would be able to prove at an evidentiary hearing that the allegations he presented against counsel Taratuta's representation.  Undermined his trial rendering the proceedings unreliable, but also, that counsel's conduct belies any sound trial strategy.

  Petitioner must be allowed to cross-examine counsel on these allegations, and counsel must be allowed to establish for the record the specific content of his trial strategy, that would substantiate his conduct during the representation of Petitioner.

  Where each of the allegations Petitioner has cited can be deemed to constitute ineffective assistance of counsel. Absent a sound trial strategy, an evidentiary hearing should be granted to explore both the allegation, and the trial strategy of counsel.

See CRISP v DUCKWORTH 743 F2d 580, 584 (7th 1984): (Trial counsel cannot stand behind the shield of trial strategy for failure to interview readily available witness whose testimony would have been noncumulative and potentially aided the defense). GROSECLOSE v BELL 130 F3d 1161 (6th Cir 1992): (Trial counsel's failure to have any defense theory compounded with other errors constituted ineffective assistance of counsel). FREEMAN v CLASS 95 F3d 639 (8th Cir 1996): (Found ineffective assistance of counsel for failure to request cautionary instructions on the credibility of accomplice testimony). RUMMEL v ESTELLE 498 FSupp 793 (W.D.Tex 1980): (Found ineffective assistance of counsel for failure to investigate facts of the offense and pursue defense of lack of intent due to intoxication).

Petitioner has the burden of overcoming the STRICKLAND standard if he is to prevail on his 6th Amendment claim. Since the record is not sufficient for Petitioner to meet this burden, an evidentiary hearing is required.

Petitioner alleges that counsel Taratuta had knowledge of alibi witness LaToya Smith as well as supporting alibi evidence. Counsel failed to investigate Petitioner's alibi defense, and refused to interview alibi witness Ms. Smith, nor did he prepare Petitioner's alibi so that it had any real possibility of being used at trial.

Petitioner offers to provide testimony by LaToya Smith, that she not only was with Petitioner at the time the crime Petitioner stands convicted of occurred, but that she also made every effort to provide counsel Taratuta with this information, but counsel refused to contact her.

Petitioner further offers to prove that counsel had no real intent to make ready Petitioner's alibi defense as he neglected to also interview witnesses of the Detroit Police Department, who possess testimony that would contradict the prosecution's theory that Petitioner used the weapon obtained in this crime. Police Officers responded to the shooting secured and searched the area for evidence, but retrieved no empty shell casings. Counsel Taratuta, instead of questioning these

witnesses; known as Terrance Sims and Micheal cook the first responding officers. Eugene Fitzhugh and Frank Horan the evidence technicians in charge of gathering and logging the crime scene evidence. Counsel waived the presence of these witnesses without giving any weight to the exculpatory nature of their testimonies.

Counsel Taratuta further waived witnesses Brandon Robinson and Odetah Boatwright who witnessed the shooting. Both gave statements to the police that they observed 5 men present together at the time the shooting occurred, and after the shooting all 5 men took off running. Both never gave the slightest inclination that any of them stopped to retrieve shell casings, that were absent, and would have given veracity to the prosecutor theory. Counsel Taratuta gave no weight to these witnesses testimony. Opting to waive the presence of these witness as he did the Police Officers testimonies.

Further, despite that being provided with alibi evidence, and despite having witnesses who without interviewing, counsel could not know whether they would aid the defense. Counsel ill-advised Petitioner to withdraw the alibi defense moments before trial. This would constitute ineffective assistance of counsel if established on record to be proven true. See MATTHEWS v ABRAMAJITYS 319 F3d 780 (CA6, 2003).

The court in ABRAMAJITYS ruled that Petitioner was denied the effective assistance of counsel where counsel failed to affirmatively assist in Petitioner's defense. The Court found that counsel made no effort to present potential alibi witnesses whose testimony, even if not conclusive, would have been useful. In the present case, LaToya Smith, although not with Petitioner the entire day, states that she was with Petitioner during the time the shooting of Darryl Towns took place.

The Court in ABRAMAJITYS furthered determined, counsel had appeared to have actively barred Petitioner from introducing his alibi witness and failed to present the admissible evidence he had that would emphasize flaws in the state's case regarding discrepancies in the witnesses identification of Petitioner.

In the instant case, Petitioner was barred from

presenting his alibi witness defense due solely to counsel's failure to prepare the defense for trial. The State case against Petitioner, like ABRAMAJITYS is marked with flaws. The state has never produced any motive why Petitioner would commit such a crime. While it also presented a case based exclusively on the testimony of co-defendant who, unlike Petitioner, did have a motive to shoot the deceased. The State also has presented evidence that Petitioner obtained a handgun earlier that day, but has neither produced physical evidence, or testimony that this gun is in fact the weapon used in this crime. As previously stated, the gun in question was a 32. caliber semiautomatic. However, no such casings were found at the scene of the shooting. Again, like ABRAHAMJITYS this case has its issues with identification. In that, no one outside of the co-defendants were able to identify Petitioner as actually being present at the scene of the shooting. There was never a time schedule presented to establish Petitioner not being able to be anywhere other then the crime scene. There also is conflicting identification of the shooter between the co-defendants and other prosecution witnesses. Co-defendant Lynell Drake states that the shooter had on a red jacket, and all of the other prosecution witnesses states that the shooter had on all black. The identification is very necessary, because the physical evidence needed to validate the prosecution's theory is absent.

Furthermore, of the testifying co-defendants, all of them received substantially reduced penalties. To be exact, "PROBATION" in exchange for their testimony. Only one co-defendant alleged to have seen Petitioner commit this act. This testimony comes from Patrick Roberts who has since retracted his testimony, and stipulated that he provided false testimony out of fear for his life, and the life of his family.

The ABRAMRJITYS court, further ruled that counsel's ineffectiveness can not be deemed harmless, given the evidence against Petitioner was not so great that a reasonable possibility that the outcome of trial would have been different absent counsel's errors exists.

In the instant case, the errors surrounding Petitioner's alibi defense is not the only allegations raised against counsel Taratuta, however, these errors, as with ABRAMAJITYS can be enough to warrant reversal.  The evidence against Petitioner is not so great that counsel's errors can be deemed harmless.  There is no physical evidence which links Petitioner to this crime. In fact, the only evidence against Petitioner is co-defendants testimony.  Testimony which given the facts, is not genuinely motivated, but rather offered in exchange for plea agreements. That allowed each co-defendant to avoid possible conviction on First-Degree-Murder which is mandatory life in prison, or Second-Degree-Murder which consist of life or any number of years. Their testimonies lacked true credibility, but their credibility was not able to be considered in this case because of the invalid jury instruction.  Further, their testimonies are inconsistent with other prosecution witnesses as well as the lack of physical evidence.  In the case of Mr. Roberts having recanted his testimony, counsel failed to properly present Petitioner's alibi witness defense inwhich Mr. Roberts now gives validity to, can not be seen as being harmless.  Moreover, that a different outcome had the likelihood of being reached had these errors not occurred.

Given the facts, Petitioner should be allowed to develop the record to prove these claims, and to show that the proceedings cannot be taken as reliable, as it reached its decision absent this probative evidence.

Petitioner seeks to develop his claim that counsel Taratuta did not fully explore the benefits that testifying co-defendants received in exchange for their testimony against Petitioner.

Counsel did not explore beyond a cursory view the full extent that each co-defendant received in exchange for their testimony.  Given the weight of testimony that these co-defendants placed on the states case.  Counsel should have effectively made the jury aware that this case was predicated solely on the credibility of these co-defendants, and challenging their credibility should have became top priority.

Counsel did not seek to ascertain for the jury's review the charges, pleas, or what length of sentences the co-defendants were promised. Counsel never explored why, or if their true motive for accepting the plea agreements was to accept responsibility for their roles in the crime. Counsel should have made the co-defendant answer why it took until the day of Petitioner's trial, (April 3, 2000) to render the guilty plea.

Counsel Taratuta further neglected to explore whether waiting until the day before Petitioner's trial was in fact a tactic used by the prosecution to insure that the co-defendant would testify in the manner the prosecution wanted them to.

The State ruling rejected Petitioner's claim that counsel failed to explore the benefits of the co-defendants plea agreement, finding that the Court had prohibited counsel from doing so. Petitioner wishes to challenge this factual finding, but requires an evidentiary hearing to do so. Whether the trial judge interruption during the redirect-examination of Mr. Roberts (T, 144-145, 4/5/00), is the reference the state court eludes to, or if it is the very fact that the prosecutor consciously decided to delay the plea agreement for the co-defendants until the day before Petitioner's trial. Which of a necessity meant that no sentencing of either co-defendant had taken place, is not clear.

If it is the former, it must be noted that prior to the Court's interruption two other co-defendants had been questioned, and counsel Taratuta made no effort to explore fully the benefits of their pleas. If it is the latter, it does not negate the conduct of counsel for failing to make reference to this factual matter, and relate it to the question of credibility that should have been the focus of this line of questioning.

No sound strategy can be said to exist for failing to challenge the credibility of testifying co-defendants. Given the lack of any overwhelming evidence linking Petitioner to the shooting. Along with an absence of motive, counsel Taratuta had every expectation to thoroughly challenge the credibility of each co-defendant, and allow the jury to unmistakably

understanding that each co-defendant had received great benefits in exchange for the testimony they gave. Had the jury known, the likelihood of finding at least one juror skeptical of their motive of intent may have lead to the vote of acquitting Petitioner.

Given the prejudice that this insufficient questioning created regarding Petitioner's state proceeding can not be viewed as reliable, nor can counsel Taratuta's conduct be seen as trial strategy. This would constitute ineffective assistance of counsel if proven true. Wherefore, Petitioner seeks an evidentiary hearing to show forth this claim.

The related claim which Petitioner seeks to develop the factual basis on is also that counsel Taratuta failed to object to the jury instruction that did not properly indentify the co-defendants: Mr. Nettles, Mr. Drake, and Mr. Roberts as Accomplices, and therefore their testimony as Accomplice-testimony, but rather identified them as Disputed-Accomplices, and therefore their testimony as Disputed-Accomplice instead of the necessary Undisputed-Accomplice testimony.

The difference in the two jury instructions are unmistakable. Where the wrong instruction was given, the UndisputedAccomplice instruction should have been given thus prejudice is automatic.

The jury was erroneously sent into deliberation viewing the testimony of the co-defendants as though they may not have actually participated in this crime when they were the very cause of its existence. As such, the instructions does not allow for the questioning of their credibility to be argued and thus considered.

However, its an undisputed fact that each co-defendant participated, and was originally charged with open murder for the death of Darryl Towns.

Counsel Taratuta failed to object to the Courts instruction that the co-defendants were Disputed-Accomplices, and trial strategy cannot be seen as excusing this conduct.

Petitioner must be allowed the chance to cross-examine

counsel Taratuta regarding this issue to properly address it within his federal claim.

Petitioner has the burden of showing through <u>STRICKLAND</u> that this conduct fell below a reasonable standard, and that it was not trial strategy on counsel's part.  Unless counsel is questioned Petitioner has no hope of meeting this requirement as the record is not sufficient to do so.

If proven, this conduct would constitute ineffective assistance of counsel, See <u>FREEMAN</u> supra at 639, as prejudice is automatically attached where one jury instruction must be given, and another is given instead.

Petitioner seeks an evidentiary hearing to develop his claim that counsel Taratuta was ineffective for failing to object to a defective reasonable doubt jury instruction.

The trial Judge gave the jury an erroneous reasonable doubt instruction just as the jury was retiring for deliberation. Counsel Taratuta made no objection to the reading as given by the court.

No sound trial strategy can be said to exist for failing to insure that the jury has the correct instruction to deliberate the elements of an crime.  This claim is argued elsewhere with Petitioner's claim, but here within, its referred to for the purpose of addressing the ineffectiveness of trial counsel. It is therefore a necessity that an evidentiary hearing be granted to allow for the material facts to be developed.

Trial counsel witnessed the above issue without objecting, and other claims held within this Petition for writ of habeas corpus.  Counsel conducted himself below an objective standard which prejudiced Petitioner as it deprived him his right to a fair trial for failing to object tothe cumulative errors which arose from trial.

There exist no less than ten potentially reversible issues that occurred under counsel's representation.  Any number of which would have effected the outcome of Petitioner's trial if properly objected to, and argued during the trial phase. Whether the trial court would have ruled in Petitioner's favor

can have no bearing on counsel's duty to object and argue the cliam, nor can it have any bearing on counsel's duty to argue before the court. Such numerous errors have occurred that a cumulative effect denied Petitioner a fair trial.

Counsel Taratuta made no such claim. Petitioner must be allowed an evidentiary hearing to cross-examine counsel, and assess what strategy he employed that prevented him from arguing that cumulative error had occurred which required reversal.

Petitioner should be entitled to an evidentiary hearing where the Supreme Court has previously ruled in its <u>KENNEY v TAMAYO-REYES</u> 504 US 1, 112 Sct 1715, 118 L Ed 2d 318. That a state-habeas Petitioner who has failed to develop the material facts of his claim in state court is entitled to do so in Federal Court if he can make a showing of manifest injustice.

Where <u>KENNEY</u> focused on insufficient hearings, Petitioner has had no hearing at all for his claims, barring the state court's decision as sufficient where its decision has been reached without full review of the material facts.

Petitioner states that this is sufficient grounds to find the AEDPA ban inapplicable.

Petitioner further points to the recent Supreme Court ruling of <u>TOWNSEND v SAIN</u> 372 US 293, 9 L.Ed 2d 770, 83 Sct 745 that an evidentiary hearing is mandated due to Petitioner not having been provided the opportunity to develop the material facts at the state level although a proper request for a Ginther Hearing was made. See <u>PEOPLE v GINTHER</u> 350 Mich 436; 212 NW2d 922 (1973).

The recent Supreme Court ruling in <u>MASSARO v UNITED STATES</u> 123 Sct 1690, 155 L Ed 2d 714 (2003), which established precedence, that ineffective assistance of counsel claims may be raised for the first time in a 28 USC § 2255 Petition, without being required to meet the cause and prejudice standard of § 2255. While Petitioner acknowledges that, <u>MASSARO</u> does not have absolute application in his 28 USC § 2254 Petition, would make light that, the Supreme Court, within its ruling made clear that oft-times the record is too vague at direct appeal to allow for

a thorough review of the claim of whether trial counsel was effective or not.

In the instant case, the same circumstances apply. Therefore, Petitioner believes that <u>MASSARO</u> should have application here, as support that the AEDPA band must not apply.

Petitioner has raised various 6th Amendment claims that arose during the course of his representation by counsel Taratuta. Not withstanding these claims, Petitioner seeks the opportunity to make a record of his reasons for requesting replacement of counsel Taratuta at the time his motion for substitution was made.

Trial judge Warfield Moore jr., continuously interrupted Petitioner as he attempted to state "GOOD" why substitution was warranted.

Judge Moore's refusal to grant Petitioner's motion was an abuse of discretion, as it was done absent a full accounting of the nature of Petitioner's request, as well as the absence of a proper inquiry by the Court. Petitioner attempted to express that a conflict of interest had created a breakdown in his relationship with counsel Taratuta.

The conflict being rooted in Petitioner's ignorance of what direction counsel Taratuta intended to present his defense.

Petitioner's objection came during counsel's attempt to question Petitioner's mental competence. Petitioner had no knowledge counsel intended to present this testimony, nor did Petitioner have knowledge that counsel intended to abandon his alibi defense until minutes before he entered the court room for the beginning of trial.

Had Petitioner been allowed the opportunity to present his reasoning for requesting replacement counsel, the matter had the chance of being properly resolved. Whether it resulted in the replacement of counsel Taratuta or not, the Court would have been made aware of Petitioner's concerns, and possibly been able to better explain to Petitioner, a lay person, the intricate procedures and safeguards of his rights to trial.

Judge Moore's improper conduct which has been demonstrated numerous times before, and resulted in his suspension from his judicial duties, [IN RE MOORE 464 Mich 98, 119; 626 NW 2d 374 (2001)] from failing to allow Petitioner the opportunity to establish "GOOD CAUSE" for substitution of counsel, was an abuse of discretion. However, proper review to make this determination requires an evidentiary hearing for Petitioner to develop the factual record to support this claim.

An evidentiary hearing is also required due to the manner in which Judge Moore resolved this motion. In refusing to perform a proper inquiry, Judge Moore instead placed the responsibility on counsel Taratuta to divulge his own ineffectiveness. This in and of itself created a conflict of interest. U.S v DELMORE 87 F3d 1078 (9th cir 1996): (The district court created conflict of interest by forcing counsel to prove his own ineffectiveness).

Petitioner has shown that a conflict of interest was created which was irreconcilable prior to the commencement of trial. The court's insufficient manner of addressing Petitioner's concerns, futher complicated the situation, and even had it been determined that Petitioner's reasonings were insufficient to replace counsel Taratuta. The court's creation of a irreconcilable conflict by shifting the burden of investigating counsel's ineffectiveness made it impossible for Petitioner to be properly represented where a conflict of interest exists. CUYLER v SULLIVAN 446 U.S. 261, 67 L Ed 2d 220, 101 Sct 1097 (1981).

Counsel Taratuta, once given the erroneous burden of divulging his own ineffectiveness became the servant of two masters. He was expected to represent Petitioner without violation while at the same time, to make no conduct which would reveal he had been ineffective in any pre-trial conduct.

Petitioner's allegations to counsel Taratuta cites numerous omissions and failures to object to the prosecution's presentation of this case. Counsel's conduct belies sound trial strategy.

It cannot be assumed that after Judge Moore's placing upon counsel Taratuta the burden to divulge whether he had been ineffective in representing Petitioner did not effect his trial strategy from that point on.

A decision beneficial for Petitioner that would run afoul to exposing a lack of preparation on counsel's part, presumably would be ignored.

Petitioner has asserted a claim of innocents, and presented valid alibi evidence including un-interviewed alibi witness. Counsel's failure to contact this witness, and substantiated her testimony automatically risks exposure were he to challenge rigorously the prosecutions lack of physical evidence to link Petitioner to this crime.

The theory that Petitioner had obtained the murder weapon earlier that day would reasonably be challenged from the shell casings. A fact able to be introduced through the questioning of Police Officer witnesses that counsel Taratuta wrongfully waived. As well as witnesses Brandon Robinson and Odeatha Boatwright who would have challenged any theory that any of the 5 accomplices stopped to retrieve the shell casings missing from the crime scene. Both witnesses along with other prosecution witnesses gave statements that once they heard gunshots they saw everyone immediately runaway.

These statements, and the lack of physical evidence would solidify Petitioner's alibi as well as magnify counsel Taratuta's unpreparedness to present Petitioner's alibi defense as well as any other defense.

Petitioner must be allowed to develop the facts of this issue to fully show how his right to counsel had been deprived to him prior to his request for replacement counsel, and how his right to a fair trial was deprived to him when the Court abused its discretion by denying his request for substitution of counsel. Petitioner must be allowed to show that Judge Moore made no inquiry into his reasoning for making a request to replace counsel, but that Judge Moore placed that responsibility on counsel Taratuta. Petitioner must be allowed

to show that counsel Taratuta represented him under a conflict of interest. The relationship between him and counsel had broke down prior to trial, and that it was only magnified through Judge Moore's improper conduct. An evidentiary hearing must be held if Petitioner is expected to meet the standard of review for this claim under MORRIS v SLAPPY 461 US 1, 103 Sct 1610, 75 L Ed 2d 610 (1983).

For these stated reasons, Petitioner requests an evidentiary hearing to develop the factual record that will allow for proper review of his Federal claims. Citing KENNEY supra, TOWNSEND supra.

The AEDPA ban of 28 USC § 2254(e)(2) should not be held to Petitioner, and his request for an evidentiary hearing should be granted.

DAMON L. SMITH  #311644
Petitioner-Pro Per
Saginaw Corr. Fac.
9625  Pierce Road
Freeland, Mich  48625

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



DAMON L. SMITH

        Petitioner,

v.

BLAINE LAFLER,

        Respondent.

_____/

CASE NO. 04-74233
HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE
HONORABLE VIRGINIA M. MORGAN
UNITED STATES MAGISTRATE JUDGE

### Proof of Service

The undersigned certifies that on the date set forth below, he served a copy of the following papers:

1. Brief in Support of Petition for Writ of Habeas Corpus;

2. Motion For Evidentiary Hearing;

3. Brief-in-Support of Motion for Evidentiary Hearing;

4. Three Affidavits and Two Letters;

5. Proof of Service.

upon:

    Raina Korbakis (P49467)
    Assistant Attorney General
    Attorney for Respondent
    Criminal Appellate Division
    P.O. Box 30217
    Lansing, Michigan 48909
    (517) 373-4875

I declare under penalty of perjury that the foregoing is true and correct, executed on

July 18, 2005

_____
Damon L. Smith #311644
Saginaw Correctional Facility
9625 Pierce Road
Freeland, Michigan 48623

**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

### AFFIDAVIT

I, Damon L. Smith, being sworn, state that the following is the truth.

1)   That during preliminary examination defense counsel Stephen Taratuta begin destroying the Attorney/Client relationship when Mr. Taratuta sat silently and allowed Mr. Smith to partake in a prejudiced in Court identification, and the alleged shooter had on a mask that covered his face making it impossible to identify.

2)   That Mr. Taratuta allowed the corrupted identification into evidence so that Mr. Smith may be bonded over to stand trial.

3)   That during preliminary examination Mr. Taratuta refused to request that Mr. Smith's name be redacted from the reading as defense counsel Ms. Sager requested for her client Lynell Drake. Mr. Taratuta's failure to request that Mr. Smith's name be redacted from Patrick Roberts' statement resulted in a full front page article of the Detroit News Sport section with Mr. Smith whole name printed. Which falsely stated that Mr. Smith committed the murder of Darryl Towns.

4)   That on October 29, 1999 at the arraignment before Judge Warfield Moore Jr., Mr. Smith expressed his dissatisfaction with Mr. Taratuta to Judge Moore, and his concerns about Mr. Taratuta not coming to visit him. Mr. Smith also expressed his desire to replace counsel Taratuta, but he was consoled and insured by Judge Moore that counsel Taratuta was a very fine Lawyer. Then Judge Moore instructed Mr. Taratuta to go and visit Mr. Smith, or he will be forced to fire him.

5)   That Mr. Taratuta strongly revealed his unwillingness to adequately represent Mr. Smith 3 days before trial was to begin. Counsel told Mr. Smith that Lynell Drake and Jonathan Nettles had signed plea agreements to testify against

Mr. Smith. When Mr. Smith asked Mr. Taratuta what it is that they are going to testify to Mr. Taratuta was clueless, and made a reference to their statements. In Mr. Drake's statement he never mentioned Mr. Smith's name, or stated that he saw who shot Darryl Towns. Mr. Nettles statement never mention Mr. Smith at all.

6) That when Mr. Smith requested for Mr. Taratuta to find out what Mr. Drake and Mr. Nettles were going to testify to in order to prepare for trial 3 days away, Mr. Taratuta showed no concern or determination to prepare for trial.

7) That on March 13, 2000, less then 3 weeks before trial Mr. Smith was assigned a investigator named Michael P. Martin.

8) That Mr. Smith supplied Mr. Martin with a list of witnesses names, numbers, and their relevance to Mr. Smith's case.

The list was as followed:

A) Damus Taylor who was intended to testify as one of Mr. Smith's alibi witnesses, but after an investigation could only account to the time of being at home after the crime happened.

B) Larry Austin who was intended to testify as one of Mr. Smith's alibi witnesses, but after investigation he could only account to the time of Mr. Smith's presence home after the crime happened.

C) Destini Smith was intended to testify as an alibi witness, but she stated that she was down stairs sleep, and Mr. Smith was up stairs during the time the crime happened.

D) Latoya Smith was suppose to testify as an alibi witness, but was never interviewed or investigated. Latoya and Mr. Smith was upstairs watching the MTV Music Awards together during the time this crime occurred.

E) Charles Kendront who was intended to testify that on September 10, 1999. Mr. Smith was present at work at Nu-Nu Unisex Salon cutting hair as he has done everyday.

F) Domonique Tobias was intended to testify at trial

to the fact that she and Mr. Smith had plans for the evening, and was going to get together the evening of Sept. 9, 1999. Ms. Tobias is the reason that Mr. Smith needed to get home, and the main reason why Mr. Smith got dropped off at home before the crime occurred.

      9) That investigator Martin contacted all of Mr. Smith's witnesses, except LaToya Smith, and was able to verified all the information that Mr. Smith gave to him.

      10) That investigator Martin and Mr. Smith tried working and planning a acquitting defense with Mr. Taratuta, but they both were unsuccessful in every attempt.

      11) That on the day of trial Patrick Roberts signed a plea agreement to testify against Mr. Smith. Once again Mr. Smith asked Mr. Taratuta what was the testimony going to state, and Mr. Taratuta appeared clueless and unconcern.

      12) That on the day of trial Mr. Taratuta on his own inclination proceeded to conduct a hearing to obtain a psychological evaluation for Mr. Smith. After Mr. Taratuta revealed his belief that Mr. Smith was guilty through such a request, and the diligence of his pursuit to try to elicit mental deficiencies from Mr. Smith's mother. Mr. Taratuta turned and asked Mr. Smith did he want to proceed with trying to obtain the psychological evaluation, Mr. Smith quickly stated no, and then proceeded to fire Mr. Taratuta.

      13) That Mr. Taratuta then stood and asked to be withdrawn, but was made to proceed by Judge Moore.

      14) That Mr. Taratuta stood in front of the jury and held up the front page of the Sport section where Mr. Smith whole name was printed, and already had him guilty of the crime and stated to the jury: "On December 24, Christmas Eve, did any of you (jury) read the front page of the Sport section." Judge Moore had to stop Mr. Taratuta, because he was about to completely elaborate on the content of that article.

      15) That after Mr. Taratuta revealed the article in the News Paper, there was nothing done or said to stop any of the jurors from going to read that News Paper.

16)   That on the day of trial Mr. Taratuta told Mr. Smith that he needed to sign off on the alibi defense so that the prosecutor can not bring the topic up to seem as though Mr. Smith was lying about his alibi defense.

17) That Mr. Taratuta stated that Mr. Smith was only signing off on Damus Taylor and Larry Austin, and not LaToya Smith. Mr. Taratuta insured Mr. Smith that LaToya Smith was going to testify at trial along with Domonique Tobias and Charles Kendront.

18)   That during trial Mr Taratuta and Mr. Smith started arguing because Mr. Taratuta started dismissing witnesses with valuable testimony that may have changed the out come of the trial.

19)   That Mr. Taratuta sat silent and let Mr. Smith read bits and pieces of a letter that he wrote, and was not allow to read the whole letter.  The few lines that Mr. Smith did read was taken out of content, and when he told Mr. Taratuta he tried to obtain the whole letter, but it was snatched away by the prosecutor, and Mr. Taratuta never objected or asked that the letter be submitted into evidence so that the jury may have read the entire letter.

20)   that during sentencing Mr. Smith stated his dissatisfaction with the representation that he received during trial.  Mr. Smith even wrote a letter to Judge Karen Fort Hood stating his dissatisfaction with Mr. Taratuta, and the fact that Mr. Smith did not receive a fair Trial.

21)   That Judge Moore Acknowledged the letter and told Mr. Smith to take it up on appeal, but allowed Mr. Taratuta to remain as his Lawyer knowing the full extent of Mr. Smith's complaints through the letter to Judge Hood. (Attached as Ex. A).

22)   That upon request for a new trial, Mr. Taratuta just stood by silently as Mr. Smith tried to obtain Justice, and correct the problem that Mr. Taratuta had done.

**MR. SMITH STATES THAT ALL OF THE ABOVE IS TRUE**

**AND HIS SIGNATURE BELOW VERIFIES IT.**

DAMON L. SMITH

Subscribed and sworn before me, this _12th_
day of _July_, _05_, a Notary Public
in and for _Saginaw_ County,
State of _Michigan_

Emory Duane Bell
(Signature)
NOTARY PUBLIC

My Commission expires _Sept 30_, _06_

Acting in Saginaw Co.

**EXHIBIT B**

STATE    OF    MICHIGAN

IN THE 3rd JUDICIAL CIRCUIT COURT

IN THE COUNTY OF WAYNE


STATE OF MICHIGAN)
                 ) ss.
COUNTY OF WAYNE  )


A F F I D A V I T

I, LATOYA SMITH, being first duly sworn, says that the following
is true to the best of my knowledge and recollection;

1. That during the year 1999, I resided at the residence of
15716 Pierson Rd. in the City of Detroit.

2. That on the day and evening of September 9, 1999 I was at
home, at 15716 Pierson Rd with my uncle Damon Smith at 9:00 p.m.
until i retired to bed.

3. My uncle Damon and i were watching television together on
September 9, 1999.

4. That i recall this evening very clearly, because we were
watching the MTV Music Awards, and they came on at 9:00 p.m.

5. That i have tried to express this information to Damon Smith
lawyer, but he refused to interview me.

6. That i wanted to testify to the above at the trial of Damon
Smith but was prevented to do so by his lawyer, Stepehen Taratuta

7. That i am willing to testify to the above ststements as they
are the truth, whenever i am called upon to do so.


THE ABOVE IS TRUE AND MY SIGNATURE BELOW VERIFIES THIS STSTEMENT.

Ms. LATOYA SMITH

LAVONNE MARIE DENNIS
Notary Public, Wayne County, MI
My Commission Expires Apr. 22, 2005

STATE OF MICHIGAN
CITY OF DETROIT
CRIMINAL DIVISION OF THE THIRD JUDICIAL CIRCUIT COURT

People of the State of Michigan,

v.

Case Number 99-10166

Hon. W. Moore

Damon Smith, et al,
     Defendant,

Stephen M. Taratuta (P46935)
Attorney for Defendant
3700 Cadillac Tower
Detroit, MI 48226
313-964-5777

Kenneth J. King
Asst. Wayne County Prosecuting Attorney

## NOTICE OF ALIBI DEFENSE

NOW COMES THE DEFENDANT, Damon Smith, by and through his attorney, Stephen M. Taratuta, and pursuant to M.C.L. 768.20 gives notice to the prosecutor that the Defendant intends to claim alibi as a defense. The Defendant claims that he was at the home of his mother, located at 15716 Pierson, Detroit, MI 48223, during and after the time of the alleged incident.

The Defendant intends to call the following as witnesses to establish that defense:

- Larry Austin    20601 PATTON ⟨AT PLYMOUTH⟩ DETROIT MI

- Damus Taylor    400 INDUSTRIAL WM PLYMOUTH ME

- Others

Respectfully,

_____
Stephen M. Taratuta
Attorney for Defendant

Date: 3/25/2000

RECEIVED BY

MAR 3 1 2000

CHIEF COURT...
WAYNE COUNTY
PROSECUTING ATTORNEY'S OFFICE

IN THE 3rd JUDICIAL CIRCUIT COURT

IN THE COUNTY OF WAYNE

STATE OF MICHIGAN)
                ) ss.
COUNTY OF WAYNE  )

A F F I D A V I T

I, Patrick Roberts, being first duly sworn, say that the following is the truth about this occurrence.

1)   That I, Patrick Roberts, am a accomplice in the occurrence that took place on fielding street in the city of Detroit on September 9, 1999.

2)   That on September 9, 1999, Damon Smith did not shoot, or in any other way cause the demise of Darryl Towns.

3)   That on September 9, 1999, Damon Smith was not involved with the tragic altercation of Darryl Towns that took place on fielding street in the city of Detroit.

4)   That on September 9, 1999, Jonathan Nettles, Lynell Drake, and I dropped Damon Smith off at 15716 Pierson (Mother's house) in which he stayed, then Nettles, Drake, two of Nettles friends, and I went on fielding to confront Darryl Towns for beating up Jonathan Nettles earlier that day, and witnessed the tragic altercation that Damon Smith is wrongfully convicted of.

5)   That my life is in absolute jeopardy if I do not collaborate against Damon Smith, because Jonathan Nettles had to have revenge.

6)   That Jonathan Nettles, Lynell Drake, and I conspired to accuse Damon Smith of this crime for the convenience, and the avoidance of being confined.

7)   That I am positively certain that Damon Smith did not perpetrate the demise of Darryl Towns, because he was not at the scene of the crime, and the 32. automatic weapon that was identified, and was said that Damon Smith used to commit this crime was never taken out of the trunk of Jonathan Nettles car to be used in this tragic occurrence.

THE ABOVE IS TRUE AND MY SIGNATURE BELOW VERIFIES THIS STATEMENT

LAVONNE MARIE DENNIS
Notary Public, Wayne County, MI
Commission Expires Apr. 22, 2005

*LaVonne M. Dennis*    *Patrick J. Roberts*    6/16/03
6/16/03           Patrick J. Roberts

What's up? I pray that you doing alright in there!
Me my self I am just happy that you for gave me
for what I'hve done to you I didn't mean to
bring you in to this but I know you was going
to be brought in this situation one way or the
ther but I didn't think that you would get in it
this deep, but only reason I said that was cause John-
then told me that if I tell the truth that some
thing was going to happen to our family so I get real
scared. Arteece was asking me who did it and I was
telling him the truth but he keep on saying that he
me you did it so stop lying them him, & Delonya came
over and was asking what happen and Arteece told
them I was lying, then I though about what them
two guys said they was going to do if I told on
them so I closed my eyes and start talking, mostly
mostly every thing I said was true but I put
you in it I am sorry I did that to you I
was just thinking about our family!
I don't think you know what really happen, after we
top dropped you off John, Lynell and me, were riding
round for a few minute and John san two guys
hat he knew so John pulled over and talk to
hem and told them what happen and they got in
he car and said lets go over there, they were
naking up a plan to get back at old boy so we

then pass his house to see who was all there, John said that his crazy cousin was there and he might got a gun, me two well one of them was like so what we do to, it was just really one of them talking the most but they told John to park in front of this house that was around the block from old boy so we all get out the car, it was a bat on the floor of the back set and lynell told me to give it to him. John an lynell went up to old boy house first, I was on the other side of the street with the to guys one of them put on a mask and when I seen John and I old boy fighting I run across the street and hit old boy he fell against the house next his house & I look back & seen one of John friends pointing a gun at old boy cousin so me, John lynell was over old boy and I don't know what happen because it happen so fast but old boy cousin run in the house and he come back out side quick but right before he came out side John friend said that he was going to get his gun, right when he said gun was out the house so I start runing and I hurd un shoots so I start runing faster to the car, lynell ran home I went and got in the car with John and his two friends, when they was taking me home one of the guys said that if I say any thing they going to kill me and others. when I came in the house you was asking me what happen but I

didn't want to talk, that's why!!!
Well dem doing all right ance dim about
to go.

One Love
Pete Ditty

RhRickRobeRts
P.O. Box 349
WhitmoRe LaKe, Mi
48189



5-137

DETROIT MI 482
PM
29 M?
2001

33 USA

USA 1¢

SPF

MR. DAMON Smith #311644
MiCHiGAN RefoRMATORY
1342 WEST MAIN STREET
IONiA, Mi
48846

1

1   STATE OF MICHIGAN

2   THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

3   CRIMINAL DIVISION

4   PEOPLE OF THE STATE OF MICHIGAN,

5

6   Plaintiff,                     Case No.

7   -vs-                           99-10166-01

8

9   DAMON SMITH,

10

11   Defendant.

12   _____/

13   SENTENCE
     PROCEEDING HAD and taken in the
     above-entitled cause before the HONORABLE WARFIELD MOORE Jr.,
14   Judge of the Third Judicial Circuit Court Criminal Division
     for the County of Wayne in Detroit, Michigan, on Friday, May
15   4, 2000.

16   APPEARANCES:

17   KENNETH J. KING   P54983
     1441 St. Antoine
18   Detroit, Michigan  48226-2302
     (313) 224-5777
19   WAYNE COUNTY PROSECUTING ATTORNEY

20   Appearing on behalf of People.

21   STEPHEN M. TARATUTA   P46935
     65 Cadillac Square  Suite 3700
22   Detroit, Michigan  48226
     (313) 964-5777
23

24   Appearing on behalf of Defendant.

25

FEB 13 2001

2

1          I    N    D    E    X

2

3

4        .

5

6

7

8              E   X   H   I   B   I   T   S

9

10   None offered.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          Friday, May 4, 2000

2          Detroit, Michigan

3          ———    ———    ———

4          (Whereupon proceedings were began at

5     11:14 a.m.)

6          THE CLERK:  This is **Case No. 99-10166**

7     **People of the State of Michigan versus Damon Lamar**

8     **Smith**, this matter is here for Sentencing.

9          THE COURT:  This matter is here for

10    sentencing.  Mr. Smith was tried by jury on the charge

11    of Murder in the First Degree, Possession of a Firearm

12    in the attempt to commit a Felony.

13          Jury deliberated, after deliberation jury

14    returned its verdict finding the Defendant herein guilty

15    of the crime of murder in the First Degree and

16    Possession of a firearm in the attempted commission of a

17    felony.  Pursuant, the Defendant had been already

18    remanded to the custody of the sheriff set today and

19    date for sentencing and referred him to the probation

20    department for a Presentence Investigation and Report.

21          The record should reflect that we have

22    received a copy of that report.  We have it, we've read

23    it, it was dated 5-4-2000.  The date of sentencing which

24    is today's date.

25          We also received a letter from -- it was

5

1    given some consideration in terms of their own pleas in

2    connection with this, that is true, but that all was

3    indicated on the record and certainly indicated to the

4    jury, jury knew what and why each of these persons were

5    testifying, that they had been implicated in this matter

6    and that they were allowed to plead to something less

7    than murder.

8                And they had all been charged with an

9    open count of murder, all those juveniles in connection

10   with this matter, and that they were allowed to plead to

11   all of that.

12               All of those factors were sent out to the

13   jury, known by the jury, known to the jury, and the jury

14   in considering which was properly done.

15               Mr. Taratuta cross-examined them on those

16   matters and cross-examined every witness.  And the jury

17   heard all of the evidence in this matter.  And the jury

18   rendered its verdict.  It is now the responsibility of

19   this court to impose sentence.

20               Mr. Taratuta, why don't you make your

21   appearance on the record.

22               MR. TARATUTA:  Good morning, Your Honor.

23   Steve Taratuta appearing on behalf of Mr. Smith.

24               We've had the opportunity to review the

25   presentence report, there's one correction to be made.

6

1   It indicated Mr. Smith was not employed, he indicates he

2   was working also at a temporary staffing agency.

3                    THE COURT:  I thought it said that he cut

4   hair, I thought it was indicated in the presentence

5   report that he was cutting hair on Joy Road somewhere.

6                    MR. TARATUTA:  Yes, Your Honor.

7                    THE COURT:  And they went to verify that,

8   they could not verify because your client apparently

9   wasn't able to tell them the exact place, but it was

10  indicated and I came to the impression that's what he

11  did both by his own statement and the statement of his

12  relatives.

13                   MR. TARATUTA:  Yes, Your Honor, that was

14  it, other than that there are no additions, deletions,

15  or correction to be made.

16                   Mr. Smith denies his guilt and claims his

17  innocence still to this day, Your Honor.

18                   THE COURT:  What's your name, sir?

19                   THE DEFENDANT:  Damon Smith.

20                   THE COURT:  Is it true you've gone over

21  this presentence report with your attorney and after

22  having gone over it with him you have no corrections,

23  additions, or deletions to make.

24                   THE DEFENDANT:  All except for the

25  employment.

1           THE COURT:  Well the employment I'm

2  saying that I disagreed that it says you weren't

3  employed it says that you cut hair and that your -- and

4  that you did it at this shop on Joy.  And that you --

5  and this was verified by your relatives.

6           So I got the impression that you were

7  employed in a kind of self-employed you weren't on

8  payroll at that.  But you weren't there and did you --

9  what you did make was about four to eight hundred a

10  week.

11           THE DEFENDANT:  For my midnight job I was

12  holding, it was for a staffing company.

13           THE COURT:  You were working, that's

14  fine.

15           THE DEFENDANT:  I said it still wouldn't

16  change nothing.  Nothing is going to change the verdict

17  that's for sure.

18           Anything else you wish to say?

19           THE DEFENDANT:  On my behalf?

20           THE COURT:  Sure.

21           THE DEFENDANT:  Yes, Your Honor.  First

22  of all I'd like to give my remorse and my great

23  heartfelt sympathy to the family of the Towns Family for

24  any involvement in this case that I might have had.  But

25  I still like to claim my innocence.  And let them know

8

1    on everything I love that I didn't kill Darryl Towns.

2                    And for the record it's because I have

3    two little sons and I can sympathize as being a parent

4    how it would feel to loose a child.  So therefore, in

5    order for me to go and take someone else's life I have

6    to look at how I would feel in this same situation as

7    though it looked at my children.

8                    And I also like to state I do believe I

9    did not have a fair trial considering the fact I was

10   already guilty because I came into the courtroom, or

11   even before there was a verdict rendered on me.

12                   And I also feel as though when Mr.

13   Taratuta told the -- stood up and told the exact date of

14   the date I was in the newspaper and my name and it was

15   stated that I was the murder right there.  I was already

16   guilty and nothing was taken into consideration to see

17   that the jury did not go and read this newspaper.

18                   THE COURT:  What are you suggesting we go

19   burn all the newspapers from that year or so ago?

20                   THE DEFENDANT:  No, you could have

21   changed the jury or something.  And when I stood up and

22   I asked to have Mr. Taratuta Fired it was for a valid

23   reason it was because I felt I couldn't be represented

24   and it was violating my Sixth Amendment, the right to a

25   fair trial.

9

1    THE COURT:  What does the Sixth Amendment

2    say?

3    THE DEFENDANT:  Word for word I cannot

4    quote..

5    THE COURT:  Okay.  Thank you.

6    THE DEFENDANT:  But as far as it still

7    states the right to a fair trial and I feel as though

8    honestly that all of this evidence that was in the case

9    still has not been brought up.

10   THE COURT:  Your cousin lied when he said

11   you came by the house and got the gun?

12   THE DEFENDANT:  No, sir.

13   THE COURT:  So your cousin was telling

14   the truth?

15   THE DEFENDANT:  Yes, sir.

16   THE COURT:  Your cousin got on the stand

17   and said you came by and that Mr. Nettles had came by

18   and was having a problem with somebody, and you wanted

19   to hold the gun and he gave you a gun that's the truth?

20   THE DEFENDANT:  That's the truth.

21   THE COURT:  And you took the gun from his

22   house, went and took it to this car where these other

23   youngsters were Mr. Nettles Mr. Drake and your -- Mr.

24   Roberts your brother and you got in the car with the

25   gun?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  That's all the truth?

3    THE DEFENDANT:  Yes, sir.

4    THE COURT:  The truth, the only thing

5    that is not the truth is that you shot the gun and it

6    killed Mr. Towns, so everything else is pretty much the

7    truth?

8    THE DEFENDANT:  No, sir.

9    THE COURT:  What wasn't the truth?

10   THE DEFENDANT:  The fact that I went over

11   there on Fielding with them is not the truth.

12   THE COURT:  Well I say -- okay, you

13   didn't go on Fielding, but Mr. Nettles came to your

14   house, you went with your brother and the other young

15   teenagers, you went with them.  You did go over to the

16   house on -- your cousin's house, you did secure a gun.

17   You did take that gun, you did go out -- you did go out,

18   you did get in the car, you did all of that; is true you

19   say correct?

20   THE DEFENDANT:  Yes, sir.

21   THE COURT:  But then of course, you said

22   hey take me home it's your suggest there that you went

23   back home, got of the car and further that than, but

24   leaving the gun of course, in the car.

25   THE DEFENDANT:  Yes, sir, but to my

1    understanding, my understanding was not that they were

2    going.

3                    THE COURT:  I don't care what about the

4    understanding just so we know that everything was spoken

5    is not -- you say not a fair trial.  This is the

6    testimony and the evidence that came out, all of this

7    came out.  And especially about getting the gun because

8    neither Mr. Nettles, Mr. Drake, or Mr. Roberts your

9    younger brother, your blood brother, had a gun.  And you

10   apparently didn't have one either, but you had to go

11   over to your other cousin's house to get a gun.

12                   And he said you came in and told him you

13   wanted to hold it because Mr. Nettles had, had this

14   disagreement.

15                   THE DEFENDANT:  No --

16                   Well that's a lie, so you didn't tell him

17   that, but you did get the gun from him?

18                   THE DEFENDANT:  Yes, sir.

19                   THE COURT:  And you took that gun and

20   went out and got in the teen-anger's car?

21                   THE DEFENDANT:  I put the gun in the

22   truck.

23                   THE COURT:  You went and got in the car

24   with the teen-angers?

25                   THE DEFENDANT:  Yes.

12

1       THE COURT:  No doubt about it you put it

2  in a sock?

3       THE DEFENDANT:  I did not testify there

4  was --

5       THE COURT:  There was testimony, I didn't

6  say you did?

7       THE DEFENDANT:  Whether it was in a sock

8  or not and it got out of the truck and shot and killed

9  Mr. Towns.

10      THE COURT: I don't know if that was the

11 begun that killed Darryl towns or what it was for the

12 simple fact --

13      THE COURT:  But you were told that.  If

14 you didn't shoot him you were certainly advised that,

15 that was the gun that was used weren't you?

16      THE DEFENDANT:  I don't know, no I

17 wasn't --

18      THE COURT:  You mean your brother and no

19 one else ever told you since your brother -- since your

20 brother was there and Mr. Nettles, Mr. Drake, no one

21 ever told you if you weren't there that gun you had

22 gotten from your cousin was used to kill this man?

23      THE DEFENDANT:  No, sir.

24      THE COURT:  You -- you were never told

25 that?

1              THE DEFENDANT:  No, sir.

2              THE COURT:  You were only told that after

3 you got arrested?

4              THE DEFENDANT:  Yes, sir.  Because at my

5 trial they did not even state what kind of gun was used

6 in this murder.

7              THE COURT:  A hand gun.

8              THE DEFENDANT:  Caliber.  But that's not

9 even, you know, to the point.  Where it could have been

10 proven my innocence was my witnesses that I had.  The

11 witnesses that he subpoenaed was not the main witnesses

12 that would verify what I was doing, the witnesses that

13 he had knew that I was home.

14              THE COURT:  Who did you want?

15              THE DEFENDANT:  Yes, my sister and my

16 cousin.

17              THE COURT:  Why didn't you just call

18 them?

19              THE DEFENDANT:  My sister --

20              THE COURT:  Why didn't you tell your

21 mother to bring them?

22              THE DEFENDANT:  You can ask Mr. Steve

23 Taratuta.

24              THE COURT:  Sir, why didn't you just say,

25 your mother testified in this matter in reference to

14

1    your sister, or your brother in reference, why didn't

2    you just say mama bring sister?

3                    THE DEFENDANT:  I did, Your Honor.

4                    THE COURT:  Your mother wouldn't bring

5    your sister?

6                    THE DEFENDANT:  I couldn't tell my mother

7    I told Mr. Steve Taratuta.

8                    THE COURT:  Why didn't you tell other

9    than Mr. Taratuta?

10                   THE DEFENDANT:  I did not talk to my

11   mother, when I called her this evening she was not

12   home.

13                   THE COURT:  This matter has been pending

14   since October of last year.

15                   THE DEFENDANT:  I thought that I was up

16   under the impression that my witnesses was going to get

17   up on the stand the Thursday not Wednesday because

18   everything --

19                   THE COURT:  Sir, let me tell you

20   something.  We told you, I know I told you, and I know

21   the record will reflect, we said that everybody get your

22   witnesses here on the date the trial starts.  Now

23   everyone, every witness -- we have a trial we have

24   witnesses here on this trial every witness cannot be

25   called at the same time we can only call one at a time,

1   bandana around the bottom portion of it; do you remember

2   that?

3   A   Yes, sir.

4   Q   And that older person was you wasn't it sir?

5   A   No, sir.

6   Q   Weren't you with them?

7   A   No, sir I was not with them.

8   Q   You were not with Lynell Drake?

9   A   No, sir I was not with them.

10   Q   You were not with Patrick Roberts?

11   A   No I was not with Patrick Roberts.

12   Q   You were not with Jonathan Nettles?

13   A   No I was not with Jonathan Nettles.

14   Q   You maintain you went home, right?

15   A   That's right.

16   Q   And who was home?

17   A   LaToya, which is my niece.

18   Q   How old is LaToya?

19   A   About 14, 15.

20   Q   Where is LaToya?

21                     MR. TARATUTA:   Judge, objection to that,

22   that calls for speculation.

23                     THE COURT:   I don't know if it calls for

24   speculation or not.

25   CONTINUING BY MR. KING:

**EXHIBIT C**

Honorable Karen F. Hood,

I pray that this letter greets you in good spirits, and health. I have a very, very important matter, and due to the circumstances its out of my control now.

On April 3, 2000 in front of Honorable Warfell Moor jr. I Damon L. Smith, had a trial, which i was charged with 1st degree murder, and i was found guilty of that charge. I truly felt i was misrepresented by my court appointed lawyer.

1). I wanted to fiber him in Oct 1999, but Honorable Warfell Moor jr. stated that he was a very fine lawyer, and instructed him to come and see me. That he did, and stated to me that he wasn't my girlfriend so hes not going to come every time i called, besides he only received 50 per visit. At the same time he has me thinking the evidence the prosecuter had was not enough. That's the reason i didn't fiber him then. Plus, my family couldn't afford a lawyer at that time. Sence this is the first time i ever been in any trouble in my 24 yrs on earth, im new to the system. He could of told me anything i would of believed him about court and the system.

The last three weeks before my trial i was appointed an investigator. The investigator, and i communicated with him more than i ever did my lawyer. i gave the investigator addresses and phone numbers of my witnesses. The two that he subpoenaed wasn't sure of the time, but they wasn't my main witnesses. The friday before my

trial i told my lawyer, and the investigator to go and serue my sister a subpoena for my neice, because shes only 15-16, and my other little sisters 21. My lawyer read for me the way he was going to present my case. I could tell he really haven't read my case. Plus, im just recieved the news that the prosecuter offered my three co-defendents a much lesser charge to testify against me. My lawyer told me this than rushed out the bull pin. I didn't see him again fill monday morning at trial. I gaue him the research i've done, and more fact from the gran. About my case, because i can tell that what he read fri. he did read ouer my transcrips.

2), I tryed to firer my lawyer again befor trial, because i knew he wasn't going to fight for me. My life is on the line, and he just through my work in his bag. So i stood up and asked Honorable Wartell Moor jr. if i can firer my lawyer. i knew he really didn't care at that point. Then he stood up and asked to have his self removed. The Judge told him that if he really fill that he couldn't represent me properly than let him know, but what about me, its my life. My lawyer didn't say anything so we proceeded with the trial. Everything just got worst from that point on.
My lawyer stood in front of my jury and said "Christmas Eve" 1999 did any one read the Detroit News. The Judge stoped him as he held the artical up to the jury to

see. This artical was front two pages of the sports section. In the paper it already has me convicted of this crime. With my full name and age. The Judge didn't do any thing about this. My jury had three day to read this paper.

Then my lawyer dismissed witnesses that in there statements gave different descriptions of the shooter.

Then when i asked about my witnesses he told me i don't need them. i argued with him, but trial was going on and i didn't know what to do. "Plus" i had the stress of everyone lying on me to save there own self.

"Your Honor", i don't know much about the law, but i do know right from wrong. i am innocent of these charges, "i promise". My transcripts prove it, and my witnesses would of told it. My lawyer failed to attemp to prove it. My right to an fair trial was dismissed with the evidence my lawyer didn't present.

i pray, and ask that you please grant me a retrial, "Please". Thank you for your time, "God Bless you".

"Truly innocent,"

Damon L. Smith

99#25122

P.S.
i get sentence on
May 4, 2000.

**EXHIBIT D**

Department of Corrections
# SENTENCE INVESTIGATION REPORT

*I3116YY*

4835-6145
Rev 03/1999  CFJ-145

| | | | | | |
|---|---|---|---|---|---|
| Honorable: **WARFIELD MOORE, JR.** | | County: **WAYNE** | | Sentence Date: **05/04/2000** | |
| Attorney: **STEPHEN TARATUTA** | | Status: **APPOINTED** | | | |
| Defendant: **DAMON LAMONT SMITH** | | | Age: **24** | D.O.B.: **08/30/1975** | |

## CURRENT CONVICTION(S)

| Docket # | Final Charge(s) | Attempt | Max | Jail Credit | Bond | Proposal B |
|---|---|---|---|---|---|---|
| 99-10166 | **FIRST DEGREE MURDER** | No | L | 230 | No | Yes |
| | Convicted by:**JURY** | Date of Conviction: **04/11/2000** | | Habitual: **No** | | |
| 99-10166 | **WEAPONS - FELONY FIREARMS** | No | 2 | 230 DAYS | No | Yes |
| | Convicted by:**JURY** | Date of Conviction: **04/11/2000** | | Habitual: **No** | | |

Pending Charges:
**NONE**

Pending Where:
**N/A**

Plea Agreement: **NONE**

## PRIOR RECORD

| | | |
|---|---|---|
| Convictions: # Felonies **0** | # Misdemeanors: **3** | Juvenile Record: **No** |
| Probation: Active **No** | Former: **No**   Pending Violations: **No** | |
| Parole: Active **No** | Former: **No**   Pending Violations: **No** | |
| Current Michigan Prisoner: **No** | MDOC#: **NONE** | |
| Currently Under Sentence: Offense **NONE** | | |
| Sentence **N/A** | | |

## PERSONAL HISTORY

| | | |
|---|---|---|
| Education:**12**   Employed: **No**   Where: **N/A** | | |
| Psychiatric History: **No**   Physical Handicaps: **No** | Marital Status: **SINGLE** | |
| Substance Abuse: Drugs **No**   How long: **N/A** | Alcohol Abuse: **No**   How long: **N/A** | |

PA511 ELIGIBLE : **No**

Investigating Agent: **BASSETTE D**         Agent Phone: **224-2524**         Caseload No.: **1915**

## DEPARTMENT OF CORRECTIONS RECOMMENDATION

INCARCERATION IS MANDATORY.

CONSECUTIVE SENTENCING APPLIES.

RESTITUTION IS SET AT $3,280 FOR FUNERAL EXPENSES.

Approval: _____                    Date: _____

Supervisor: **AGNELLO G**         Supervisor Phone: **224-2643**

Local Computer #:  280667-1
1835.00
04/26/2000

SMITH, Damon
99-10166 / F-280667-1
PAGE 1

## EVALUATION AND PLAN:

The defendant, Damon Lamont Smith, is a 24 year old single father of two children. He claims to have attended high school in Kentucky at a Baptist seminary. This information could not be verified. After completing high school, the defendant returned to Detroit and was employed as a hairstylist at a hair salon located on Joy Rd., Detroit, MI. This information could not be verified. The defendant is in good health and he denies use of drugs or excessive drinking of alcohol.

In the case now before Your Honor, the defendant denies his guilt. He does not have a juvenile record and he owes $328 for a suspended license ticket and $195 for a speeding ticket in the 34th District Court, as well as $370 for a suspended license ticket in 34th District Court, Dkt. #99-70490; 99-180395A; C984616.

Favorably speaking, the defendant has the support of his family and his parents are both concerned about his welfare and the defendant was a musician in his church choir.

Negatively speaking, the convictions now before Your Honor require a mandatory term of imprisonment.

The defendant is not eligible for community probation programs and there are no guidelines in either felony conviction.

Restitution has been determined at $3,280, payable to the deceased complainant's family for funeral expenses. This amount should be equally divided among the four co-defendants, which would result in an $820 responsibility for each co-defendant.

Consecutive sentencing applies.

## AGENT'S DESCRIPTION OF THE OFFENSE:

On 9/9/99, at approximately 9:40 p.m., officers from Detroit P.D. responded to 9559 Fielding, Detroit, MI concerning a shooting. Upon their arrival at the scene, the officers observed 15 year old complainant, Darryl Towns, laying on the ground from a gunshot wound to the stomach. Towns was conveyed to the Wayne County Medical Examiner's Office. An autopsy was performed and the cause of death was a result of multiple gunshot wounds.

Witnesses reported that they saw Jonathan Nettles and Lynell Drake on complainant's porch and that both Nettles and Drake were banging on complainant's door messing with him. The complainant came out the side door and was telling Nettles and Drake to leave his house and go home. Both subjects refused to leave and Nettles and the complainant got into a fight. The witness and another person broke up the fight. As Nettles was leaving, he told the complainant

SMITH, Damon
99-10166 / F-280667-1
PAGE 2

to "Watch his back". The witness reported that later he saw Nettles and Drake, along with three or four other males, pull up and drive around the corner from the complainant's home. The witness then saw three males run up the driveway and that he and another person started to go to complainant's home. He then heard three gunshots and then saw the males run out of the driveway and saw Drake also run out of the driveway and run to his home. He then heard someone yell that the complainant has been shot.

Another witness reported that he was sitting on a porch down the street from complainant Towns' home. He saw three males walk up to the complainant, who was standing in the driveway. One of the men had a baseball bat. The man threatened to hit the complainant in the head and then three men jumped on the complainant. This witness went over and broke up the fight an then two other males came from across the street. An older male pulled out a gun and pointed the gun at the witness and told him to stay out of it. The witness stated that the older man walked up to where complainant was laying on the ground and shot him.

Artice Thomas stated that defendant, Damon Smith, came over to his home on 9/9/99 and asked him for a gun. Thomas gave Smith a .32 caliber automatic. When Thomas asked why he wanted the gun, Smith said that Jonathan Nettles had a fight with a guy and that he was going to the guy's home and see why he jumped on Nettles.

The defendant, Damon Smith, was arrested and charged with Murder First Degree, Premeditated and Felony Firearm. Jonathan Nettles, Lynell Drake, and Patrick Roberts were charged with Open Murder.

Co-defendant Lynell Drake pled Nolo contendere to Felonious Assault on 3/30/00. On 4/27/00, he was sentenced by the Hon. Warfield Moore under Dkt. #99-10166-03.

Co-defendant, Patrick Roberts, pled guilty to Involuntary Manslaughter on 4/3/00. He is scheduled to be sentenced by the Hon. Warfield Moore on 5/23/00, Dkt. #99-10166-04.

Co-defendant, Damon Smith, was found guilty, by jury, of Murder First Degree on 4/17/00. He is scheduled to be sentenced on 5/4/00 by the Hon. Warfield Moore, Dkt. #99-10166-01.

Co-defendant, Jonathan Nettles, pled guilty to Involuntary Manslaughter on 3/31/00. He is scheduled to be sentenced by the Hon. Warfield Moore on 5/23/00, Dkt. #99-10166-02.

## CONSECUTIVE SENTENCING:

Consecutive sentencing is applicable.